**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Charles JACKSON and Anthony Wayne Browning, Defendants-Appellants.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael RYAN, Defendant-Appellant.**

Nos. 86–1226, 86–1381.

United States Court of Appeals, Fifth Circuit.

Dec. 24, 1986.

Rehearing En Banc Granted Feb. 10, 1987.

Reavley, Circuit Judge, concurred specially and filed opinion.

See also, 634 F.Supp. 1101, 760 F.2d 570.

Opinion on rehearing, 5th Cir., 811 F.2d 269.

Roddy L. Harrison, Pecos, Tex., for Jackson.

Robert Ramos, Fed. Public Defender, Kevin E. Shannon, Asst. Fed. Public Defender, El Paso, Tex., for Browning.

Sidney Powell, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S.

Charles Louis Roberts, Joseph (SIB) Abraham, Jr., El Paso, Tex., for Ryan.

Before CLARK, Chief Judge, REAVLEY and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants Charles Jackson and Anthony Wayne Browning were convicted of conspiracy to possess controlled substances with intent to distribute and of possession of controlled substances with intent to dis-

tribute. Appellant Michael Ryan, in a wholly separate episode, was convicted of possession of controlled substances with intent to distribute. We have consolidated these three cases for consideration on appeal. All three appellants challenge the legality of searches conducted at the Sierra Blanca, Texas, checkpoint, operated by Border Patrol agents of the Immigration & Naturalization Service. We continue to hold that searches at this checkpoint are the functional equivalent of border searches, and we affirm the convictions.

## I.

### A. *Jackson and Browning*

On March 31, 1984, appellants Charles Jackson and Anthony Wayne Browning drove a 1984 Chrysler with California plates eastbound on Interstate 10 across west Texas. At about 3:30 p.m., they reached the Sierra Blanca Border Patrol checkpoint, located approximately four miles west of Sierra Blanca, Texas, approximately twenty miles from the Mexican border, and approximately eighty miles southeast of El Paso. Jackson was driving the car, and Browning was lying on the back seat.

At the checkpoint, Border Patrol Agent Fogt approached the car and questioned appellants about their citizenship. Both men answered that they were American citizens. Fogt testified that the men responded to his question reluctantly. Through the window of the auto, Fogt observed cigarette rolling papers on the floor of the back seat, and a small glass pipe on the rear floorboard.[1] After viewing these items, Fogt opened the back door of the car and inspected the pipe and rolling papers, noting that the mouthpiece of the pipe was covered with a white residue.[2]

At Fogt's request, Jackson opened the trunk of the car. There, Fogt found a woman's red cosmetic case, labelled as belonging to Sherry Bradley. Inside the case

1. While Jackson asserted that Fogt could not have seen the pipe from the window, Browning admits that the agent did see the pipe when he looked into the car.

2. The residue was later identified as cocaine.

was a bottle of pills which Jackson identified as antihistamines. In fact, the pills were "Preludin," a controlled substance. Inspecting the rest of the trunk, Fogt found boxes and sacks containing over 3500 "Preludin" pills. Further inspection of the back seat of the Chrysler led to the discovery of marihuana residue.

At first, appellants denied any knowledge that there were drugs in the car, asserting that the Chrysler had been rented and loaded by a person otherwise not involved in the case, Jim Johnson, in California. However, Jackson was listed as a driver on the rental contract, and he later admitted that he knew the drugs were in the car. Browning never admitted to such knowledge.[3] He did admit, however, that he saw in the trunk the boxes and red cosmetic case which contained the pills and that the cigarette rolling papers in the back seat had fallen out of his pocket.

Appellants were indicted for conspiracy to possess Preludin with intent to distribute and for the substantive offense of possession with intent to distribute. At trial, they moved to suppress all the evidence seized at the Sierra Blanca checkpoint, and the district court granted the motion. *See United States v. Oyarzun*, 582 F.Supp. 121 (W.D.Tex.1984). We reversed and remanded, holding that the search of the car at Sierra Blanca was valid because the checkpoint was the functional equivalent of the border. *United States v. Oyarzun*, 760 F.2d 570 (5th Cir.1985).

On remand, appellants requested that a traffic survey be conducted at Sierra Blanca to test the validity of the checkpoint's "functional equivalent" status. The district court granted the request, ordering the Border Patrol to conduct a survey of all traffic passing through the Sierra Blanca checkpoint for a period of two weeks. We stayed the order, then vacated it in a writ of mandamus issued on October 21, 1985. Appellants made a second motion requesting that the Federal Public Defender's office be given authority to take a survey. The district court granted this motion. After setting various guidelines, we granted the Public Defender's office the requested authority to conduct a survey from January 8 through January 15, 1986.

The survey, at the request of appellants, asked drivers to state (1) the point of origin of their present trip, and, if that point was outside the United States, (2) whether the traveler had already been stopped and inspected or questioned at a port of entry into this country or at some other checkpoint. The overwhelming majority of the drivers stopped at the Sierra Blanca checkpoint stated either that they had begun their trip in the United States, or that they had already been stopped at a port of entry or other checkpoint.[4]

Appellants presented the survey results to the district court. The court held that the survey evidence, collected in January 1986, did not establish the conditions present in March 1984, when appellants were stopped. Accordingly, the court held that the checkpoint's status as the functional equivalent of the border in 1984 was unaffected by the new evidence.[5] Subsequently, the court found appellants guilty

---

**3.** Browning claimed that he went along for the ride from California only because Jackson's mother was paying him $200 to drive the car to Texas with Jackson.

**4.** The survey was conducted at the request of appellants under authority granted by this Court. We do not accept or reject the findings as demonstrative of any traffic pattern at the Sierra Blanca checkpoint. We have great reservations, however, concerning the reliability of conclusions drawn by appellants based upon the survey. The questions inquired as to the origin of a driver's journey, not as to whether the journey took him across the border. The irrele-

vance of the answer to the former question is demonstrated by the five drivers who stated that their point of origin was Hawaii. Of course, this answer tells nothing about whether these cars had been across the border and thus constituted "international" traffic. The same can be said for the six-hundred odd drivers travelling east whose origins were in states east of El Paso.

**5.** The district court also concluded that the new evidence was sufficient to establish that, as of January, 1986, the Sierra Blanca checkpoint could not enjoy "functional equivalent of the border" status.

on all counts, and sentenced them to concurrent three-year terms of imprisonment.

Before passing sentence on appellant Browning, the district court gave him the opportunity to address the court, and he did so. The court did not, however, give Browning's counsel the opportunity to address the court on Browning's behalf before sentence was pronounced. Browning's counsel pointed out that he had not waived his own right of allocution. The district court apologized, and then gave appellant's counsel the opportunity to address the court. Browning's counsel did so, after which the court stated: "I apologize to counsel for overlooking allocution. My sentence would be the same, even though I would consider the remarks."

Appellants now claim that the Sierra Blanca checkpoint did not meet the requirements for classification as the "functional equivalent of the border" at the time of their arrest, and that probable cause did not exist to search their vehicle. Appellant Browning also challenges the sufficiency of the evidence regarding his convictions for conspiracy and possession, and claims prejudicial error in his sentencing before his attorney's allocution.

### B. *Ryan*

On February 7, 1986, approximately one month after the Sierra Blanca survey had been conducted by the Federal Public Defender's office, appellant Michael Ryan drove a white Chevrolet up to the Sierra Blanca checkpoint. Border Patrol Officer Felix Chavez noticed that Ryan's vehicle swerved and halted suddenly several times as it approached the checkpoint. Chavez questioned Ryan about his citizenship, and Ryan responded hesitantly. He appeared dazed and disoriented, to the point of appearing intoxicated, although Chavez smelled no alcohol.[6]

Chavez asked Ryan to step out of the car and open the trunk. Ryan walked very unsteadily to the back of the car, and had trouble getting his key in the trunk lock. The trunk contained a backpack and a suitcase. Chavez noticed that Ryan became visibly nervous when the officer felt the backpack. Chavez instructed Ryan to open the suitcase. Ryan asked, "Do I have to?", and Chavez answered, "Yes, sir, you have to." Chavez discovered approximately seven pounds of cocaine in the suitcase.

Appellant was immediately arrested by the Border Patrol. Four hours later, a representative from the Drug Enforcement Agency arrived to take custody of Ryan. Ryan appeared "totally stoned" to the DEA agent: his speech was incoherent, his gait unsteady, and he smelled very strongly of ether. Ryan told the agent that his occupation was "to move things around." While being driven to Pecos, Texas, Ryan claimed that he was being kidnapped and asked the DEA agent if he could call the FBI.

Ryan was charged with possession of cocaine with intent to distribute. He moved to suppress all the evidence obtained at the Sierra Blanca checkpoint on the basis that the search conducted there was illegal. The district court held that the checkpoint, in February, 1986, was not "the functional equivalent of the border," but nevertheless denied appellant's motion to suppress on the basis that "ample reasonable suspicion" was present to justify the search in his case. The court found appellant guilty as charged, and sentenced him to a ten-year prison term. Appellant now claims that "probable cause," not "reasonable suspicion," was the proper standard to apply in order to test the validity of the search, and that such probable cause did not exist.

### II.

All of the appellants raise the issue of the status of the Sierra Blanca checkpoint as the "functional equivalent of the border." We have considered the issue several times, and each time we have held that

---

**6.** Chavez also noticed a black leather pouch on the front seat. The bag contained cocaine and drug paraphernalia. Chavez did not search the pouch, however, until after cocaine was found in a search of the trunk.

the classification was appropriate. *See United States v. Oyarzun*, 760 F.2d 570 (5th Cir.1985); *United States v. Dreyfus-de Campos*, 698 F.2d 227 (5th Cir.1983), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306; *United States v. Ludding-ton*, 589 F.2d 236 (5th Cir.1979); *United States v. Hart*, 506 F.2d 887 (5th Cir.1975), *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706, *reaff'd* 525 F.2d 1199 (5th Cir.1976) (on remand), *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226.

Needless to say, we will not reconsider this issue each time a search is made at Sierra Blanca. In *United States v. Salinas*, 611 F.2d 128, 130 (5th Cir.1980), we stated:

> It is not required that the underlying facts concerning a particular checkpoint location be proved over and over again in each case arising out of the same checkpoint location, so long as such facts remain unchanged. A court may take judicial notice of functional equivalent status once it has been established.

None of the evidence presented by appellants demonstrates any change in traffic patterns at Sierra Blanca. In fact, appellants Jackson and Browning assert that no such changes have occurred since the time of their arrest in 1984.

■ The established law is clear. Searches at the Sierra Blanca checkpoint are the functional equivalent of border searches and meet the Fourth Amendment requirement of reasonableness. In *Hart*, we based that finding of reasonableness on "the proximity of the checkpoint to the border, the permanent nature of the checkpoint, and the hours of operation." 506 F.2d at 895. After discussing these factors in detail, we concluded by commenting on the practical need for law enforcement near the border:

> With so much access to a highway parallel to the border by aliens who could easily have walked across the border, we think the Fourth Amendment rule of reason would permit a search for those aliens of vehicles that may have taken

them aboard after their arrival by other means within our boundaries. With almost 2000 miles of Mexican border from Brownsville, Texas, to San Diego, California, contiguous to four of the states of the Union, the impracticality of guarding every part where human crossing could be made should be so apparent as to make inexorably reasonable some method of curtailing illegal entry such as established at the Sierra Blanca checkpoint.

*Id.* at 897. Those circumstances are as fully applicable today as they were eleven years ago. Accordingly, we hold once again that the Sierra Blanca checkpoint is the functional equivalent of the border. It was the functional equivalent in March, 1984 and also in February, 1986. We find nothing in the submitted evidence in these cases to show a change in the nature of the checkpoint which raises doubts about border equivalency. Certainly the survey, taken in the light most favorable to appellants, does not do so. As we have said several times, we will not reconsider a change in the status of the checkpoint absent such a showing of change in the factual circumstances. *See e.g. Dreyfus-de Campos*, 698 F.2d at 229; *Luddington*, 589 F.2d at 242. Thus, searches are properly conducted at the Sierra Blanca checkpoint by Border Patrol agents without a finding of probable cause. Appellants' motions for the suppression of the evidence at their trials were properly denied. We do not accept the conclusion of the district court, however, that the Sierra Blanca checkpoint is no longer the functional equivalent of a border checkpoint. We hold again that it is.

### III.

■ Appellant Browning claims that even if the evidence from the search is admitted, that evidence is insufficient to support both his conviction on the conspiracy count and his conviction on the possession count. In reviewing whether there is sufficient evidence to convict, it is not necessary that the evidence exclude every reasonable hypothesis of innocence. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.

1982) *(en banc), aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Rather, we need only determine that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942).

In order to prove possession with intent to distribute, the government must demonstrate (1) knowing (2) possession of the controlled substance (3) with intent to distribute it. *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982). These elements may be proved by circumstantial as well as direct evidence. *Id.* at 61–62. Viewing the evidence and the inferences that may be drawn from it in the light most favorable to the government, we have no difficulty finding that appellant Browning's conviction for possession of controlled substances is adequately supported.

Browning's constructive possession of the controlled substances is inferred from his joint dominion and control over the car, established when he admitted that he was being paid by Jackson's mother to drive with Jackson to Houston. Browning's knowledge was demonstrated by his admission that he had seen the boxes containing the pills in the trunk, by the discovery of drug paraphernalia in the back seat of the car near Browning, and by his admission (after an initial denial) that the rolling papers found on the floorboard had fallen from his pants. Finally, the quantity of Preludin pills found in the car suffices to demonstrate an intent to distribute. *United States v. Richards,* 638 F.2d 765 (5th Cir.1981), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638. The evidence thus supports the conviction of Browning for possession of controlled substances with intent to distribute them.

Browning's conspiracy conviction is also supported by the record. In order to prove that appellant conspired, the government must show knowledge, intent and participation in the crime. These elements, however, need not be proven by direct evidence, but may be inferred. *United States v. Dean,* 666 F.2d 174 (5th Cir.1982), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303; *United States v. Marx,* 635 F.2d 436 (5th Cir.1981); *United States v. Arredondo-Morales,* 624 F.2d 681 (5th Cir.1980).

The evidence demonstrating Browning's knowledge of possession will support a finding that Browning knew of the criminal purpose of the conspiracy. His intent to conspire to commit the crime can be inferred from his admission that he knew the box containing the pills was in the trunk, and from the evidence that he was in constructive possession of the drugs. Finally, the totality of the evidence and the conclusions that Browning knew and intended to enter into a conspiracy support the inference that he in fact participated in that conspiracy.

## IV.

Finally, appellant Browning fails to demonstrate prejudicial error in the district court's asserted violation of Fed.R.Crim.P. 32(a)(1)(B).[7] Appellant asserts that the court's failure to hear an allocution from appellant's counsel before sentencing him combined with the court's subsequent failure to change the sentences after hearing the allocution raises an inference that the district court improperly used a "mechanistic" concept of what kind of punishment a particular crime deserves.

The failure of the sentencing judge to change the sentences does not establish error on the part of the district court; it may reflect only that the judge was unmoved by the allocution. Further, the light sentences ameliorate somewhat appellant's claim of error. The court imposed two concurrent sentences of three years each

---

7. Fed.R.Crim.P. 32(a) states:
   (1) *Imposition of Sentence....* Before imposing sentence the court shall

   ....
   (B) afford counsel an opportunity to speak on behalf of the defendant;....

with a five-year parole term, when appellant could have received sentences of thirty years in prison, lifetime parole, and fines totalling $250,000.00. Certainly these sentences permit an inference that the court was already disposed towards leniency before the allocution was heard.

■ Finally, when the court corrected its mistake and subsequently heard an allocution, it remedied whatever error it had previously committed. The remedy for sentencing without offering opportunity for an allocution is resentencing by the district court. *United States v. Turner*, 741 F.2d 696 (5th Cir.1984). This remedy has already been implemented, and remanding the case for resentencing would accomplish nothing. Appellant's claim of prejudicial error in the court's failure to hear an allocution before sentencing is denied.

## CONCLUSION

Appellants' claims attacking the validity of the searches conducted at the Sierra Blanca checkpoint are denied. The checkpoint is the functional equivalent of the border, and searches conducted there need not be based upon probable cause. The evidence is sufficient to support the conviction of appellant Browning on both the conspiracy and possession counts. Finally, the district court's failure to hear an allocution before sentencing appellant Browning was not prejudicial error when corrected by the court. The convictions are

AFFIRMED.

REAVLEY, Circuit Judge, specially concurring:

While I agree that this panel is bound by previous Fifth Circuit decisions finding plenary searches conducted at the Sierra Blanca checkpoint constitutional, *United States v. Luddington*, 589 F.2d 236 (5th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979), *United States v. Drey-*

*fus-de Campos*, 698 F.2d 227 (5th Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983), I must question that precedent. The constitutionality of the search for contraband approved in this case depends on Sierra Blanca's designation as a "functional equivalent of a border." Yet, this label does not accurately describe this checkpoint, since it does not, nor does it purport to, interdict exclusively *international* traffic crossing into the United States. Designating the Sierra Blanca checkpoint a functional equivalent of a border misconstrues the basis for providing border patrol agents plenary powers to search, and undermines the protections provided by the Fourth Amendment.

In *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), the Court first coined the phrase functional equivalent of a border, and described two possible examples as follows:

[S]earches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico would clearly be the functional equivalent of a border search.

The single thread connecting these two examples is the fact that searches conducted at locations functionally equivalent to a border interdict the same kind of traffic stopped at our nation's borders: international traffic. In *United States v. Alvarez-Gonzalez*, 542 F.2d 226, 229 (5th Cir.1976) (*Alvarez-Gonzalez I*) this court incorporated this factor into our tripartite test for determining functional equivalency when we held that the ratio between international and domestic traffic passing through such checkpoints must not be disproportionately domestic.[1] However, this cir-

---

1. The two remaining components of our test for determining functional equivalency include, first, that "it functions like a permanent border checkpoint and not ... on a radically shifting basis approximating the peregrinations of [a roving] patrol," and second, that "as to international traffic, the checkpoint under consideration actually approximates the effect of one

cuit's understanding of "international" is not limited to the ordinary meaning of this word, since it also includes vehicles traveling close to the border but on the American side. In *United States v. Alvarez-Gonzalez,* 561 F.2d 620, 623–24 (5th Cir.1977) (*Alvarez-Gonzalez II*) we explained:

> It would make little sense indeed to adopt a definition of "international" for this purpose which excluded those very journeys which evidence and practical experience have demonstrated are most likely to commence with an illegal international border crossing. In such situations, although the vehicle has not crossed the border, its cargo has.

*See also United States v. Luddington,* 589 F.2d 236, 241 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979) ("[I]nternational traffic for checkpoint testing purposes must include traffic originating close to the border but on the American side, since vehicles which remain in this country and await their illegal human cargo are a principal means of alien smuggling.").

In the present case, a survey was conducted to evaluate the nature, or "point or origin," of the traffic passing through the Sierra Blanca checkpoint. The data collected indicated that the overwhelming majority of this traffic was domestic in origin. The majority points out, however, that good reasons exist to doubt the reliability and validity of the survey's findings. Yet, whatever the validity of the survey, neither the government, nor the majority in this case, dispute the fact that a significant proportion of the traffic passing through this checkpoint has not crossed an international boundary. Because of our expansive definition of international traffic, this fact does not disqualify the Sierra Blanca checkpoint from functional equivalency status. Thus, the survey effectively has no meaning; by Fifth Circuit definition *all* traffic passing through the checkpoint is international, since the checkpoint itself is "near" the border.

The ostensible reason for including certain domestic traffic in the definition of international traffic is the very significant problem of illegal aliens crossing into this country at unmonitored points on foot, and then moving into the nation's interior by automobile. *Alvarez-Gonzalez II,* 561 F.2d at 625; *Luddington,* 589 F.2d at 240; *see generally United States v. Oyarzun,* 760 F.2d 570 (5th Cir.1985). As we noted in *Luddington,* "[s]hort of physically patrolling the entire length of the Rio Grande, strategically well-located checkpoints are the most effective means of dealing with this serious problem." 589 F.2d at 240. While I wholeheartedly agree with this statement, I disagree that it supports the argument that the Sierra Blanca checkpoint is the functional equivalent of a border.

In this case, just as in our prior cases, the majority relies on "the practical need for law enforcement near the border" in coming to its conclusion that "[s]earches at the Sierra Blanca checkpoint are the functional equivalent of border searches." *Ante,* at page 1190 (citing *United States v. Hart,* 506 F.2d 887, 897 (5th Cir.), *vacated and remanded,* 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd,* 525 F.2d 1199 (5th Cir.) (on remand), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976)). This "exigent circumstances" analysis, however, cannot support the conclusion that the Sierra Blanca checkpoint is a "functional equivalent of a border"; "the 'border search' exception is not based on the doctrine of 'exigent circumstances' at all." *United States v. Ramsey,* 431 U.S. 606, 621, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977). In fact, border searches are not "embraced within the prohibition of the [Fourth] [A]mendment." *Id.* (quoting *Carroll v. United States,* 267 U.S. 132, 150, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925)). The constitutional basis for searches at border checkpoints is fundamentally different from the basis for "stops" at checkpoints in the interior of the United States. We have erred in confusing the two.

physically located at the border." *Alvarez-Gon-* *zalez I,* 542 F.2d at 229.

In *Ramsey,* Justice Rehnquist explained the special analysis for border searches as follows:

Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" *by the single fact that the person or item in question had entered into our country from outside.* There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

431 U.S. at 619, 97 S.Ct. at 1980 (emphasis added).

The Supreme Court's approval of plenary searches at the functional equivalent of a border is based on this same principle, the only difference being that through necessity or convenience *border* searches are condoned away from the border. It is the *single fact* that the individual or item has entered this nation from outside that justifies the search. But our cases have discarded this singular justification for allowing searches at a border or its functional equivalent. As the majority opinion demonstrates, we now consider the constitutionality of "functional equivalents" without any regard to the source of the government's power to search at the border. The appellation, "functional equivalent of a border," has, itself, become our initial point of inquiry, rather than the historical basis for the power to search at the border.

Judge Goldberg, in an early dissent from this circuit's functional equivalency cases, refused to join the

apparent belief that functional equivalency is a concept that frees the border search principle from its historical moorings, the "right of the sovereign to protect itself by stopping and examining persons and property *crossing into this country.*"

*Alvarez-Gonzalez II,* 561 F.2d at 627 (Goldberg, J., dissenting) (emphasis added) (quoting *Ramsey,* 431 U.S. at 616, 97 S.Ct. at 1979).[2] In *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed.2d 543 (1925), the historical justification for border searches was explained as follows:

Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

The Fifth Circuit stands alone in its departure from the historical basis for border-type searches as expressed in *Carroll.* The Ninth and Eleventh Circuits, the two circuits that most closely share the illegal alien problem confronted by this circuit, have both refrained from broadening the "functional equivalent" concept to allow interference with domestic traffic. *United States v. Bowen,* 500 F.2d 960 (9th Cir. 1974); *United States v. Garcia,* 672 F.2d 1349 (11th Cir.1982); *see also United*

---

**2.** Judge Hill has also written objecting to this circuit's grant of discretion to government agents along the United States-Mexican border. In a special concurrence to an opinion upholding the constitutionality of the same checkpoint involved here, Judge Hill observed:

Given the subtle expansion by this Court of the Supreme Court's original concept of the functional equivalent of a border ... it is highly problematic whether the Supreme Court today would grant officials manning

such checkpoints, of which Sierra Blanca is one, "unbridled discretion to search any person and any vehicle for contraband without any of the constraints normally imposed upon federal officers by this Country's Constitution."

*United States v. Oyarzun,* 760 F.2d 570, 579–80 (5th Cir.1985) (Hill, J., specially concurring) (quoting *United States v. Oyarzun,* 582 F.Supp. 121, 123 (W.D.Tex.1984)).

*States v. Espinosa,* 782 F.2d 888 (10th Cir. 1986). In . *Bowen,* the Ninth Circuit explained its understanding of the "functional equivalent" concept as follows:

[F]ixed-checkpoint searches, ... even though conducted within a "reasonable distance" from the border, are not necessarily exempt from the traditional Fourth Amendment requirement of a warrant or probable cause....

The "function" of a border checkpoint is to regulate border crossings.... [I]f a search takes place at a location where a significant number of those stopped are domestic travelers going from one point to another within the United States, the search is not the functional equivalent of a border search. One need only contemplate the volume of domestic travel between Buffalo and Rochester, New York, to see why a checkpoint between those two cities could not be the functional equivalent of a border checkpoint even though the checkpoint could be less than twenty miles from an international border.

500 F.2d at 965; *see also United States v. Whiting,* 781 F.2d 692, 695 (9th Cir.1986) ("The 'functional equivalent' doctrine permits border searches at places other than the actual border where travelers functionally enter or exit the country.").

Our conflict with the Eleventh Circuit over the interpretation of "functional equivalents" is perhaps more significant than our differences with the Ninth Circuit over this matter. The Eleventh Circuit, once a part of the former Fifth Circuit, adopted as precedent the decisions of this court, *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), and thus, to differ with us, had to reject the same authority the present majority relies upon. In *Garcia,* the Eleventh Circuit declined to follow our "prior decisions in using the 'functional equivalent' language to refer to Border Patrol or other checkpoint searches," because "[t]hese searches do not fit within the traditional definition of a border search, which refers to searches of persons, conveyances, or objects that have come into the United States from outside."

672 F.2d at 1365 (citing *Ramsey,* 431 U.S. at 616–19, 97 S.Ct. at 1978–80). Thus, the Eleventh Circuit joined the Ninth Circuit in limiting the "functionally equivalent" border search to checkpoints that indeed are *functionally equivalent* to a border.

The constitutional basis for searches and seizures within the United States' borders rests on entirely different principles than searches and seizures conducted at those borders. In particular, the principles and interests underlying the Fourth Amendment constrain the scope of all checkpoint stops and searches that occur away from the border or its functional equivalent. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). Therefore, when a checkpoint intercepts traffic, some part of which is of purely domestic origin, the Fourth Amendment is implicated, and requires an independent assessment of the reasonableness of the search. The test in such cases involves a weighing of the public interest against the Fourth Amendment interests of the individual. *Terry v. Ohio,* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968).

As our cases have recognized, the public interest here is great:

The magnitude of the problem of aliens entering or remaining in the United States is staggering. The peculiar characteristics of the Texas-Mexican border—a river inappropriately named Rio Grande in that aliens can swim, wade and in some places walk across it easily—present serious problems for those enforcing the immigration laws.

*Alvarez-Gonzalez II,* 561 F.2d at 625. The need for effective police measures has been amply demonstrated, and, as my colleagues have pointed out, "some method of curtailing illegal entry [must be] established." *Ante* at page 1190, *quoting, Hart,* 506 F.2d

at 897. But the viability of the solution cannot be viewed solely by the light of the problem itself; the rights and liberties of millions of people lawfully living and traveling along the United States-Mexican border must be added to the calculus.

Enforcement officials at the Sierra Blanca checkpoint have been granted nearly free license. They assert the power of customs agents, a power, as already noted, not bridled by the Fourth Amendment. But the Fourth Amendment does not lose its vitality as it nears the border; it safeguards all residents of this nation, whether they choose to live in Lincoln, Nebraska or El Paso, Texas.

The Fourth Amendment violation at Sierra Blanca is not the checkpoint stop; it is the unrestricted scope of the search. As the Court explained in *Martinez-Fuerte*, "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." 428 U.S. at 568, 96 S.Ct. at 3087. In *Martinez-Fuerte*, the Court approved of the stopping of vehicles at permanent checkpoints so that occupants could be briefly questioned regarding their right to be in the United States. *Id.* at 558, 96 S.Ct. at 3083. The Court also found it constitutional for border patrol agents to refer motorists to a secondary inspection area for further questioning. *Id.* at 563, 96 S.Ct. at 3085. However, the Court strictly limited the scope of these stops, specifically holding that *"checkpoint searches are constitutional only if justified by consent or probable cause to search."* *Id.* at 567, 96 S.Ct. at 3087 (emphasis added); *United States v. Brignoni-Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975).

Keeping in mind that the guiding principle of the Court's Fourth Amendment cases is the reasonableness of the intrusion in light of the public interests involved, we must query how the Sierra Blanca checkpoint differs from permanent checkpoints where searches are prohibited absent prob-able cause or consent. The primary purpose of permanent checkpoints along the United States-Mexican border is to stem the formidable flow of illegal entrants from Mexico. *See Martinez-Fuerte,* 428 U.S. at 552, 96 S.Ct. at 3080; *Ortiz,* 422 U.S. at 891, 95 S.Ct. at 2586. Yet the government invokes the same argument here in urging us to allow substantially greater intrusions than the Supreme Court has so far sanctioned.

The single factor that may distinguish the present checkpoint from checkpoints previously reviewed by the Supreme Court is its distance from the border. Whereas in *Martinez-Fuerte* and *Ortiz* the checkpoints ranged from 65 to 90 air-miles from the border, *Martinez-Fuerte,* 428 U.S. at 545–51, 96 S.Ct. at 3077–79, *Ortiz,* 422 U.S. at 893, 95 S.Ct. at 2587, the Sierra Blanca checkpoint lies just 14 air-miles from the border. Arguably, therefore, under the reasonableness standard of the Fourth Amendment, some greater intrusion is warranted at the Sierra Blanca checkpoint than was approved in *Martinez-Fuerte.* Its proximity to the border makes the public interest stronger, and the government's success rate at apprehending illegal aliens higher. This proximity arguably supports, for example, the minimal intrusion occasioned by a brief check of compartments large enough to contain a person. *See e.g., Alvarez-Gonzalez II, supra.*

While there may be some merit to a "sliding-scale" measure of reasonableness based on a checkpoint's proximity to the border, the Supreme Court has adopted a more stringent categorical test. Under the Court's test, searches may occur at the border or its functional equivalent (where they are justified by the *single* fact that the traffic is international in character), or when they are supported by probable cause or consent. In *Ortiz,* for example, the Court expressly held "that at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." 422 U.S. at 897–98, 95 S.Ct. at 2589.

Importantly, however, the *Ortiz* Court qualified this holding in a footnote, stating that it did not "decide whether a warrant could issue approving checkpoint searches based on information about the area as a whole." *Id.* at 898 n. 3, 95 S.Ct. at 2589 n. 3; *see also Almeida-Sanchez,* 413 U.S. at 283–84, 93 S.Ct. at 2544–45 (Powell, J., concurring) (recommending the use of area warrants in cases involving roving patrols to balance the "legitimate interest of law enforcement with protected Fourth Amendment rights"). Since the Supreme Court did not decide this question, I will not attempt to give an answer. However, such area warrants, if approved, would serve the same function as the "sliding scale" analysis mentioned above. Specifically, a judge or magistrate would measure the reasonableness of the government intrusion by balancing the public interest with the liberty and privacy rights of people residing in or traveling through the area. At areas near the border, but not functionally equivalent to it, government interference with traffic beyond brief questioning may be justified because the public interest in stemming the flow of immigrants increases close to the border. But with a warrant requirement, such determinations would be made before the establishment of a checkpoint, based on the exigencies of the particular area, and with continuing judicial oversight.

I have concurred in this opinion solely because I am bound by our earlier cases finding the Sierra Blanca checkpoint to be a "functional equivalent of a border." However, I object to this misuse of terms that substitutes for a proper resolution of the issue. If the public interest is sufficiently great, it will justify a reasonable interference with traffic near the border. We should focus on the reasonableness of the intrusion, not sweep the whole matter under an inapt label.