UNITED STATES of America,
Plaintiff-Appellee,

v.

Lewellyn HENRY and Winston Franklin
McNair, Defendants-Appellants.

No. 87–3404.

United States Court of Appeals,
Fifth Circuit.

July 12, 1988.

George R. Simno, III, New Orleans, La., for defendants-appellants.

Lawrence Benson, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, WILLIAMS, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants were convicted by a federal jury of knowingly possessing with intent to distribute some 3,300 pounds of marijuana, and of conspiracy to do the same under 21 U.S.C. §§ 841(a)(1) and 846. The single issue presented on appeal is whether the evidence is sufficient to support the verdict. After carefully reviewing the entire record, we conclude that the evidence is sufficient to sustain the convictions. We affirm.

## I.

Appellants Lewellyn Henry and Winston Franklin McNair, along with Jerry Glenn Barnes, were arrested in New Orleans at approximately 1:00 a.m. on December 10, 1986. At the time of their arrest, these three men were in McNair's van and seeking to exit a large fenced area at Berth 6, a part of the Port of New Orleans where incoming ocean freight is held for delivery. The van contained approximately 3,300 pounds of marijuana.

A customs officer testified that, during routine inspection the previous day, he noticed that a seal had been tampered with on a large container recently offloaded from a vessel. The United States Customs Service arranged to have a surveillance team watch the container. A customs agent, who observed the incident through binoculars from a tower 200 yards away, testified that at approximately midnight on December 9, he observed a security vehicle leading a van to the container. By this time it was well past regular business hours when freight is ordinarily received and thus the area was deserted. When the two vehicles arrived at the container, two of the men took a set of bolt cutters and broke into the container. While he could not determine who actually operated the bolt cutters, the Customs official testified the area was well-lighted and there was no apparent reason why the occupants of the van could not observe this activity. Once the container was opened, the Customs officer testified that all of the men present assisted in loading the van with twenty-one thick, cardboard U-Haul boxes that were secure-ly closed with heavy steel bands. After the van was loaded, McNair got into the driver's seat and was joined by Henry and Barnes. McNair proceeded toward the exit of the fenced port area. Before the van reached the exit it was stopped by customs officers and the three men were arrested. Several of the boxes were opened and they all contained marijuana that was tightly wrapped in two or three layers of plastic which prevented detection of any odor of the contents.

Following the entry of a guilty plea, Barnes testified for the government. Barnes testified that he received a call a few days before his arrest and was told to expect the arrival of McNair in a van to pick up a load of marijuana. Barnes testified that, as expected, Henry telephoned him during the evening of December 9 and Barnes met appellants at a shopping center. Barnes then drove McNair and Henry in McNair's van to the wharf area to obtain the marijuana. Barnes testified that a paper bag partially filled with cash was in McNair's van when he met them at the shopping center. Barnes followed telephone directions he received and handed the bag—later determined to contain more than $15,000—to the security guard, Thompson, when they arrived at the gate. Thompson then got in his vehicle and led the van to the container. Barnes' testimony is generally consistent with that of the customs officers after they reached the container.

Both McNair and Henry testified in their own defense. McNair testified that he had worked for most of the previous year operating a package delivery business in New York using his own van. Most of the trips he made were in and around New York City although he occasionally travelled as far as Boston, Pittsburgh and New Orleans. Henry was an employee of the New York Racing Association and occasionally helped McNair with long distance driving. McNair testified that a few days before he was arrested, a dispatcher named "David" at Choice Courier in New York called him. David asked McNair to pick up twenty packages in New Orleans for immediate

delivery to New York City. McNair asserted that David agreed to McNair's request for a cash fee of $1,000 plus expenses. McNair testified that the dispatcher told him to contact Barnes for further instructions when he arrived with his van in New Orleans. When McNair arrived in New Orleans on December 8, he called Barnes and learned that the shipment would be temporarily delayed. McNair asserted that he then called the Choice Courier dispatcher, David, for further instructions and was told to deliver the load as soon as possible after it was ready. McNair then called Henry who agreed to fly to New Orleans and assist with the driving during the anticipated twenty-four hour, nonstop trip. McNair told Henry he would pay him $250, plus expenses for his help.

According to appellants' testimony, McNair and Barnes met Henry at the airport in New Orleans late in the afternoon of December 9 and the three men drove to Barnes' garage. Barnes told appellants that the packages would not be ready for delivery until later that evening and suggested they go sightseeing. McNair left his van with Barnes and went with Henry to tour the French Quarter. When appellants called Barnes later that evening, Barnes told them to return to his garage. Appellants contend that Barnes picked up a paper bag from his garage and the three men proceeded in McNair's van to the port area. According to appellants, Barnes spoke with the uniformed security guard at the gate and gave him the paper bag from the van. The guard then opened the gate, got into a small pickup truck and led the van to a large shipping container. Appellants admitted that they saw the guard give Barnes a bolt cutter and saw Barnes break into the container. Thereafter, according to appellants, Barnes and the guard loaded the cardboard U–Haul boxes from the container into the van. Appellants' version thereafter is generally consistent with that of the government's witnesses.

## II.

Appellants were caught red-handed with 3,300 pounds of marijuana in their possession. The only question is whether the evidence is sufficient to support the jury's necessary conclusion that appellants knowingly and intentionally possessed the marijuana and that they were knowing participants in a conspiracy to possess and distribute it. Stated in simpler terms, the question is whether the jury was entitled to infer from the evidence that McNair and Henry knew that the boxes they loaded into the van contained marijuana.

In *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) we explained the standard of review in cases alleging insufficiency of the evidence:

[To sustain a conviction] [i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

Assuming, as we must, that the jury accepted the version of the evidence favorable to the verdict, several facts could have led the jury to conclude that appellants knew the nature of their mission: (1) the visit to the deserted freight yard after midnight; (2) the delivery of the bag of money to the security guard to give appellants access to the secure wharf area and guide them to the proper container, (3) the forceable entry into the container to free the cargo; and (4) appellants' possession of approximately 3,300 pounds of marijuana.

The above facts demonstrate much more than "mere presence at the scene of a crime or close association with co-conspirators." *United States v. Magee*, 821 F.2d 234, 239 (5th Cir.1987). The facts demonstrate presence and association under an aggravated set of suspicious circumstances. As the Eleventh Circuit stated in *United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir.1985) (en banc), *cert. denied sub nom. Ariza–Fuentas v. United States*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986).

In most cases including this one ... the evidence establishes not mere presence but presence under a particular set of circumstances. In such a case, the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric. Rather, it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation.

The explanation of McNair and Henry that they were hired for a total of $1,250 by a legitimate commercial New York courier service to pick up and transport an unknown cargo to New York was uncorroborated and the jury was entitled to reject it. The jury was entitled to conclude that the facts surrounding McNair's alleged arrangement with Choice Courier was irregular. McNair testified that his customer did not identify the cargo, tell him its weight, or how it was to be handled. He produced no work order, shipment order or writing of any kind to support his testimony. He stated that he spoke with an individual at Choice Courier known only to him as "David" and he gave conflicting answers on the address of Choice Courier. He admitted that he was not asked to sign a receipt for the cardboard boxes after they were taken from the container and loaded in the van.

At bottom, the question we face in this case is whether the appellants' presence at the scene of the crime, along with the suspicious circumstances, permitted the jury to infer that appellants knew they were loading marijuana aboard the van. What a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason: what could a jury reasonably find beyond a reasonable doubt? To make this judgment, "jurors are correctly instructed to use their common sense and to evaluate the facts in light of their 'common knowledge of the natural tendencies and inclinations of human beings.'" *United States v. Cruz-Valdez*, 773 F.2d at 1546.

Although a determination of the permissible inferences that may be drawn from the evidence must be made in each individual case, we have discovered a number of cases in which this court and other circuit courts have upheld a jury finding of knowing, voluntary possession of drugs on evidence less compelling than the evidence in this case. *See, e.g., United States v. Williams-Hendricks*, 805 F.2d 496 (5th Cir. 1986); *United States v. Colindres-Davila*, 804 F.2d 623 (11th Cir.1986); *United States v. Espinosa*, 771 F.2d 1382 (10th Cir.), *cert. denied sub nom. Foreman v. United States*, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985); *United States v. Vergara*, 687 F.2d 57 (5th Cir.1982).

We are satisfied that a properly instructed jury could have inferred from the evidence outlined above that no rational person would accept the risks attendant to bribing a security guard, going into a secure wharf area in the dead of night, forcibly entering a container, and removing its contents without knowing what they were removing and loading aboard their van.

The judgments of conviction are

AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, dissenting:

A thorough reading of the record convinces me that the majority of the Court, and apparently also the jury, drew unsupported inferences from the evidence. The evidence falls far short of attaining a "beyond a reasonable doubt" standard. In fairness to the American system of justice and due process of law these convictions should be reversed.

The majority opinion quotes the correct standard which is to be applied in this case. It was succinctly stated in *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). The critical requirements are: (1) "[A] reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt," and (2) "A jury is free to choose among reasonable constructions of the evidence." This test has also come to be referred to in shorthand fashion as a "sufficient evidence" test

because of a statement immediately following the statement quoted from *Bell* in the majority opinion. This additional statement says that the evidence must be "sufficient to allow a reasonable jury" to make a finding of guilty.

It is important to emphasize, however, the requirement is that while we view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), there must be sufficient evidence to establish guilt beyond a reasonable doubt. The short answer in this case is that there are a number of key elements of evidence, viewed most favorably to the government, that inescapably fall short of a "guilt beyond a reasonable doubt" standard. I consider them in separate enumerations.

First, the key government witness in this case was Jerry Glenn Barnes, a truck driver, who under a plea agreement pleaded guilty and then testified on behalf of the government implicating defendants Henry and McNair. He testified that he received a phone call in response to which, at a later date, he met defendants in their van on a street in New Orleans, and together they drove to the parking lot of a store where he left his car and joined the defendants in their van and drove to the dock area. This phone call also told him he was to hand a bag to the security guard at the gate and "get some marihuana out of the port" [1] and that he would be picking up and helping to load a number of cartons. Finally, this caller promised him $10,000 for his services.

The testimony of Barnes contains not the slightest indication as to who might have made the phone call. He testified he did not know. Further, he specifically stated he had no idea of the location of the origin of the phone call. He testified that just before meeting defendants he received a separate phone call from them as to where to meet them and then went with them to leave his car and drive on to the dock area.

Second, contrary to the statement in the majority opinion, there is no evidence in the record whatsoever that the bag containing the cash was in the van when he got into it at the parking lot where he left his car. The only evidence with respect to the bag containing the money later given by Barnes to the security guard was a clear indication that he (Barnes) had possessed the bag when it was handed to the security guard and that it was in the van when the three men *arrived at the dock* in the van. There is no specific evidence that the bag was already in the van when he got into it. The testimony in full on this point is as follows:

Q. Were you provided any money to pay the guard?

A. Yes, I was. I had some money in a bag, yes.

Q. Who gave you that bag?

A. I picked it up out of the van.

Q. Was it in the van when you arrived?

A. Yes.

Q. Do you know how much money was in the bag?

A. No, I don't.

Q. How did you know what you were supposed to do with this bag?

A. I was told to give it to Thompson, the guard.

Q. Who told you this?

A. The guy over the phone.

The inference in the majority opinion that he was supplied the bag by the defendants is wholly unsupported in the record. The only time he "arrived" in the van was at the dock, as other testimony makes clear. Finally, there is no evidence at all in the record that defendants knew what was in the bag.

Third, Barnes is the one who opened the shipping container with a bolt cutter so that the separate sealed and banded cartons could be taken out and loaded into the van. He gave no testimony as to where he got the bolt cutter. Certainly there is no

---

1. Actually this reference to marihuana was to the "summer" of 1986. Whether this was inadvertent or not on the part of the prosecutor is not clear. If there was a summer episode involving Barnes, as appears likely, there was no evidence at all connecting defendants with it. In turn, this would mean that there is not one single mention of marihuana anywhere in Barnes' testimony as to the December episode which is before us.

testimony implicating the defendants with supplying him with the bolt cutter. Defendant Henry testified that the security guard gave Barnes the bolt cutter, and the jury was free to believe or not believe that testimony. But the critical point is that there is no testimony whatsoever implicating defendants in supplying the bolt cutter.

Fourth, the majority opinion makes an inference far beyond the facts and testimony when it concludes that Barnes "broke into" the shipping container. There is nothing in the record to indicate that there was anything unusual about the way Barnes opened the shipping container so that its contents could be removed. There is nothing in the record to indicate that it was not a routine opening of a shipping container. The testimony of a customs official was to the effect that he had earlier noticed that a seal on the shipping container had been tampered with. But there is not the slightest evidence in the record connecting defendants with such tampering. Indeed there is no evidence whatsoever in the record indicating that they even knew that there was a seal on the shipping container.

Fifth, the majority opinion draws a wholly incorrect inference from the evidence, even viewed most favorably from the point of view of the government, in concluding that this lighted, secured area at the dock was "deserted" at that time of night. Instead, the testimony of the customs agent was as follows:

A. ... This is an area, Berth Six area, is an area that is fenced in and they have a security guard who is at the gate area who allows the—authorized people to come in and out of the gate. There is no other access to the Berth Six area where all the containers are stored. Within this fenced in area there is no access to it by vehickle [*sic*] other than through this gate, where upon the guard has control. [A]nd at this particular time of night, there is very little activity out there, other than the authorized people who are involved in the discharge of the cargo on the vessel and the necessary Customs, Im[m]igration or Agriculture Inspectors involved in the actual entry of the vessel.

So the testimony was that "there is very little activity out there, *other* than the authorized people" who are acting as stevedores and the necessary governmental officials of various kinds. This then is a brightly lighted area open 24 hours a day, not "after business hours" as the majority opinion states. It was not deserted, and the security guard himself was aiding defendants and Barnes in their activities.

Sixth, there is no evidence in the record whatsoever that defendants knew that the packages contained marihuana. Barnes may have known what they contained, but there was no testimony that he told the defendants or discussed the content of the boxes at all. A customs official testified that the separate cartons were wrapped in such a way that no odor of marihuana escaped. Thus, even assuming on behalf of the government that suspicious circumstances should have convinced the defendants or shown that the defendants knew they were engaged in improper activities, there simply is nothing in the record to show that they knew that the contents of the cartons was a controlled substance. Even if illegal, it could just as well have been other contraband. And this assumption is even going beyond viewing the evidence most favorably to the government. There is at best scant evidence that this event in the eyes of defendants was anything but a lawful shipment which defendants were picking up.

The fact that there is no proof that defendants had knowledge that the cartons contained marihuana should be of itself controlling in this case. Defendants were charged with knowingly possessing "marihuana" with intent to distribute, and conspiracy to do the same. The jury was restrictively instructed that they had to find the appellants "knowingly, willfully, and intentionally possessed *marihuana* as charged." On appeal the government suggested that our cases hold that it is not required to prove that the defendant knew which particular controlled substance he may have possessed in order to obtain a conviction under 21 U.S.C. § 841(a), citing *United States v. Gonzales*, 700 F.2d 196,

200–201 (5th Cir.1983), and *United States v. Rada-Solano,* 625 F.2d 577, 579 (5th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 482 (1980). In contrast to this case, however, in both of those cases the issue was whether the court properly charged the jury that it could find defendants guilty if it found that defendants knew that they possessed *some* (unspecified) controlled substance.

More recent cases hold that in order to establish the substantive offense of possessing marihuana under § 841(a)(1), the government must prove beyond a reasonable doubt that the defendants knowingly possessed *marihuana* and intended to distribute *it. Gardea Carrasco,* 830 F.2d 41, 45 (5th Cir.1987); *United States v. Jackson,* 807 F.2d 1185, 1191 (5th Cir.1986); *United States v. Williams-Hendricks,* 805 F.2d 496, 500 (5th Cir.1986); *United States v. Moreno-Hinojosa,* 804 F.2d 845, 847 (5th Cir.1986); *United States v. Ledezma-Hernandez,* 729 F.2d 310, 314 (5th Cir.1984); *United States v. Compton,* 704 F.2d 739, 742 (5th Cir.1983). As stated above, the record discloses that there is no evidence at all that defendant's knew the cartons contained marihuana rather than something else, whether contraband or not.

Seventh, in argument the prosecutor misled the jury at least twice by patently false statements. In one instance the prosecutor said: "Jerry Barnes told you (the jury) that they all knew [the cartons contained marihuana]." This statement was flatly false. Jerry Barnes used the word marihuana only once in his entire testimony both on direct and cross-examination. That was the testimony in which he received the phone call from the anonymous person and the unknown place and to which he may have testified, "was supposed to go in Berth Five and get some marihuana out of the port." (see fn. 1, *supra* ) As mentioned above, never once did Barnes testify that he even mentioned the contents to defendants or that they gave any indication that they had any knowledge whatsoever of the contents of the shipping boxes.

In the second example, the prosecutor in argument also made much of the opening of the shipping crate with the bolt cutter. Here again, he misled the jury blatantly. Barnes himself testified that he alone opened the shipping container. Yet the prosecutor kept saying "*they* used a bolt cutter," and "somebody came all the way from New York to New Orleans ... to break into that container." And again, as emphasized above, there was no evidence that the shipping container was "broken into". There was evidence only that it was opened by Barnes.

These misrepresentations in the record show a pattern of the government undertaking to make a case against the defendants with evidence grossly inadequate to prove their guilt beyond a reasonable doubt. Viewing the evidence most favorably to the government, the only evidence actually relating to the defendants (as opposed to Barnes) is that they made a phone call one evening in New Orleans, and Barnes met them on a street. They drove their van and Barnes drove his car to the parking lot of a store where Barnes then got into the van. They drove to a secured pier and had nothing to do with arranging entry. They followed the security guard to the critical shipping container. They had nothing to do with supplying the tool for cutting open the container, or with opening it, although they saw that the container was opened by Barnes. They helped load some 21 securely wrapped U–Haul cartons into their van and started to drive out of the dock area together with Barnes when they were arrested. The cartons were found to contain marihuana. That is all the evidence, viewed most favorably to the government, relating to the defendants. This falls far short of substantial evidence establishing their guilt beyond a reasonable doubt.

Indeed, the record can be read to disclose a prosecutorial pattern to avoid asking the critical questions which, if correctly answered by Barnes, would have established the case for the government. Thus: (1) There was no attempt to find out if the anonymous caller could have been one of defendants. The jury was left with the erroneous implication that it was. (2) There was no attempt to pin down the

origin of the bag and its contents. The clear implication was that it was supplied to him by one of the defendants, but the government carefully avoided asking that question. Whether the actual testimony about the bag was contrived or not, and that is pure speculation, it is consistent with a careful orchestration to establish by innuendo something critical to the government's case without actually doing so. (3) Barnes was never asked if he discussed the contents of the cartons with defendants or mentioned marihuana to them or if they ever mentioned marihuana. (4) There was an obscure reference to another "summer" episode involving Barnes and with no evidence connecting defendants in any way. The only use of the word "marihuana" by Barnes was in connection with the summer episode, and (5) Barnes was never asked if he "broke into" the shipping container; he was only asked if he "opened" it.

To any claim that the defense could have asked these questions on cross-examination, the response is known by every competent lawyer. It is not up to the defense to establish a prosecutor's case. Further, no questions should be asked on cross-examination unless the inquirer knows the answer which must be given. And a plea-bargained prosecutorial witness is a notoriously risky witness as to veracity on cross-examination.

In total contrast to the lack of solid evidence implicating defendants, the evidence implicating Barnes is clear. Barnes is the one who received a phone call from an anonymous person and from an unknown place offering him money to get the shipment out of the dock. The caller instructed Barnes to hand a bag containing money to the guard to gain access to the berth area. Barnes obtained the bolt cutter. Barnes cut open the shipping container. Yet all of these critical activities are by some peculiar and erroneous legerdemain attributed to the defendants. The record simply does not support such an attribution at all.

It should be noted that it is obvious that the jury did not believe defendants as to their explanation of the events that occurred. But the mere unwillingness of a jury to credit the veracity of a defendant's protests of innocence does not establish a defendant's guilt. The government must advance and establish the affirmative proof of the commission of the offense by the defendant beyond a reasonable doubt. It has not done so in this case. Instead, it created only an ephemeral aura of guilt by association.

Brief mention should be made of the four cases which the majority opinion relies upon as upholding knowing and voluntary possession of drugs "on evidence less compelling than the evidence in this case." A common thread in all four of those cases was the fact that the defendant was in actual or constructive possession of the controlled substance over a substantial period of time. There it could properly be inferred that in view of the other circumstances involved in the defendant's activities, he could not help but know of the presence of the controlled substance. Thus, in *United States v. Williams-Hendricks*, 805 F.2d 496 (5th Cir.1986) (cited earlier for the proposition that possession specifically of marihuana must be proved), 30 pounds of marihuana were found hidden in a second gasoline tank of appellant's truck. Appellant's son, a mechanic, was driving the truck. Appellant, himself, was nervous during the initial check, and also the evidence showed he had not insisted upon his son's repairing the "defective" gas tank that contained the marihuana even though it meant frequent stops for refueling. In contrast, in the case before us, there was no evidence at all that defendants appeared nervous and no indication they deliberately closed their eyes to the possibility they were handling marihuana. There was a total lack of evidence of any prior relationship with Barnes which would implicate ongoing joint activity.

In *United States v. Colindres-Davila*, 804 F.2d 623 (11th Cir.1986), over 200 kilos of cocaine were found inside one of a freighter's water tanks. The chief engineer, the accused, was responsible for supervising access to the tank. When questioned he also gave evasive and uncooperated responses. In *United States v. Espinosa*, 771 F.2d 1382 (10th Cir.), *cert. denied,*

**1542**

474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985), the appellants abandoned vehicles which were being used to pick up marihuana from an airplane delivery site and were fleeing the scene. In *United States v. Vergara*, 687 F.2d 57 (5th Cir.1982), heroin dealers told the buyer (an undercover agent) that they were contacting their source and went to appellant's home. Appellant pointed to his car, and one of the dealers went to it and took out a bag found later to contain heroin.

I find it a strange characterization to say that the facts of these cases uphold a jury finding of knowing, voluntary possession of drugs on evidence "less compelling" than the evidence in this case. Instead, I would view the present case in the light of *United States v. Sneed*, 705 F.2d 745 (5th Cir.1983), applying the *Bell* requirement but finding that the conviction of the son of a man deeply involved in a marihuana smuggling scheme had to be set aside even though the evidence showed that he was present in the vicinity of the unloading of a large shipment of marihuana. In that case at p. 750, the Court quoted from two of our prior cases where we stated "Mere presence at the scene of a crime or close association with a coconspirator will not support an inference of participation ... in the criminal activity." *United States v. Vergara*, 687 F.2d at 61. "The government must show more than that the defendant was 'in a climate of activity that reek[ed] of something foul.'" *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir.1982). Defendants in this case may or may not be guilty. It is not for us to decide. But under the Constitution the United States Government undertakes the obligation to prove guilt beyond a reasonable doubt. It has not done so in this case. As we said in *United States v. Gonzalez*, 703 F.2d 807, 808 (5th Cir.1983), "Too many innocent scenarios jibe with the sparse record facts." And I cannot escape the conclusion that the Court has fallen in error of the kind warned against by us in *United States v. Flores*, 564 F.2d 717, 719 (5th Cir.1977), where we said "We will not hypothesize guilt. The presumption of innocence will not be exorcised by exercises in specula-tion." Would that this were true in this case.