REVISED - JULY 1, 1998

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 96-31030

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GAVIN ALLAN PAUL;
PATRICK CARLOS BRITTON

Defendants-Appellants.

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

May 29, 1998

Before EMILIO M. GARZA, STEWART, and DENNIS Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case is before us on appeal from defendants' convictions in the district court of one count each of conspiracy to possess with the intent to distribute cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count each of conspiracy to import cocaine hydrochloride into

the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963. For the following reasons we AFFIRM in part and REVERSE in part.

BACKGROUND

During the week of January 21, 1996, the United States Customs Service ("Customs") was contacted by a Guyanese seaman who was then serving aboard the Motor Vessel Mini Loom ("Mini Loom"). The crewman, Abdool Adam, advised Customs agents that a man known only as "Mike" had placed a quantity of cocaine on board the Mini Loom while the vessel was docked in Guyana. "Mike" had asked Adam to help him smuggle the cocaine into the United States. "Mike" instructed Adam to call a certain telephone number in Guyana once the vessel arrived in New Orleans, and explained that someone would come to take delivery of the cocaine from Adam in New Orleans.

The Mini Loom arrived in New Orleans on February 8, 1996. On the following day, the vessel was boarded and searched by United States Customs agents who discovered approximately 10 kilograms (23.2 pounds) of cocaine on board. After seizing the drugs, Customs agents then formulated a plan to make a controlled delivery of a cocaine substitute to whomever "Mike" sent to pick up the drugs from Adam.

On February 12, 1996, Adam made a number of calls to "Mike" in Guyana regarding delivery of the cocaine. Each of these calls was recorded by customs agents. In one of the calls, "Mike" told Adam that he had contacted a courier named "Harry" in New York who would fly to New Orleans to meet with Adam. In the same telephone conversation, "Mike" inadvertently revealed that "Harry's" name was actually "Gavin."

2

On the same day, in New York, Gavin Paul purchased an airline ticket for a flight leaving for New Orleans on February 13, 1996. Upon arriving in New Orleans, Paul checked into the French Quarter Courtyard Inn. Also on that day, "Mike" gave Adam a number through which he could reach the courier. The phone number was that of the French Quarter Courtyard Inn. Adam called the number and spoke to "Harry" regarding delivery of the cocaine. They arranged to meet at the docks, but "Harry" never arrived.

When "Harry" did not arrive, Adam called the same hotel telephone number and learned that "Harry" had checked out of the hotel. Customs agents were present when Paul checked out of the hotel and observed him take a taxi to the Days Inn located on Williams Boulevard near the airport. Paul checked into the Days Inn under his companion Suzette Telford's name and paid cash for the room.

When Adam told "Mike" that the courier had not arrived, "Mike" informed Adam that he had another man in town who would pick up the cocaine. Shortly thereafter, Adam received a call from a man who identified himself as "P." Adam and "P" then made arrangements to deliver the cocaine. "Mike" then called Adam to tell him that he should deal with "P" instead of "Harry". "Mike" indicated that "P" would arrive at the docks by taxi to pick up the cocaine, but that he would not have the money with him. Rather, Adam was to get the money from "Harry." "P" called Adam a few minutes later and told Adam he would arrive in about half an hour.

Thereafter, defendant Patrick Britton arrived at the dock in a taxi. Britton spoke to Adam, pulled a gray tweed suitcase out of the taxi, and handed it to Adam. Adam then transferred ten packages of substitute cocaine into Britton's suitcase. Britton then took the suitcase and drove away in the taxi.

3

A few minutes later, Harbor Police stopped the taxi and arrested Britton. At the time of his arrest, Britton had a piece of paper on which the telephone number of the dockside public telephone had been written. This telephone number was the one at which Adam had received a call from the individual who identified himself as "P."

Shortly thereafter, Paul was arrested at his hotel. Seized from the room was approximately $10,000 and an address book in which he had written the directions to where the Mini Loom was docked.

Both Paul and Britton were charged with one count each of conspiracy to possess with the intent to distribute cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count each of conspiracy to import cocaine hydrochloride into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963.

Both Paul and Britton were convicted on both the counts. Each was sentenced to 121 months for each offense to be served concurrently. Britton was also given a fine of $5,000.

On appeal, Paul and Britton argue that the evidence was insufficient to support their convictions. Additionally, Britton argues that the district court erred in denying his motion to suppress statements made in an unrelated airport stop based on an alleged violation of his Fifth Amendment rights, and that the district court erred in denying his motion for a mistrial based on the government's reference to Britton's use of stolen cellular telephone service.

DISCUSSION

I.      Sufficiency of the Evidence

4

We will find that there was sufficient evidence to support the convictions of Paul and Britton if any reasonable trier of fact could have found that the evidence presented at trial established the essential elements of the crime beyond a reasonable doubt.  See United States v. Alix, 86 F.3d 429, 435 (5th Cir.  1996).  Moreover, we review challenges to the sufficiency of evidence in the light most favorable to the Government.  See Glasser v.  United States, 315 U.S. 60 (1942); United States v. Ivy, 973 F.2d 1184, 1188 (5th Cir.  1992); United States v.  Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989).

To establish a drug conspiracy under 21 U.S.C. § 846 or § 963, the government must prove beyond a reasonable doubt (1) an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate voluntarily in the conspiracy.  United States v.  Inocencio, 40 F.3d.  716, 725 (5th Cir.  1994) (21 U.S.C. § 846); United States v.  Puig-Infante, 19 F.3d 929, 936 (5th Cir.  1994) (21 U.S.C. §§ 846 and 936).  "The jury may infer any element of this offense from circumstantial evidence."  Lechuga, 888 F.2d at 1476.  Thus, "[a]n agreement may be inferred from concert of action, [v]oluntary participation may be inferred from a collocation of circumstances, and [k]nowledge may be inferred from surrounding circumstances."  Id. at 1476-77 (citation and quotation marks omitted).  Once the Government has produced evidence of a conspiracy, substantial evidence is needed to connect an individual to that conspiracy.  United States v. Malatesta, 590 F.2d 1379, 1381, (5th Cir. 1979).   Proof of the mere presence of the defendant at a scene of criminal activity and his association with the other defendants is insufficient to support a criminal conviction.  United States v. Carrillo-Morales, 27 F.3d 1054, 1065 (5th Cir. 1994).  However, "[a] jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be

5

unreasonable for anyone other than a knowledgeable participant to be present." United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc) (cited in United States v. Henry, 849 F.2d 1534, 1536 (5th Cir. 1988)).

A.      Conspiracy to Possess

Paul

Paul argues that he was not a part of the conspiracy because he would not comply with Adam's request that he pick up the cocaine and deliver the money. Paul further argues that his actions thwarted the conspiracy and evidence his unwillingness to join the conspiracy. However, we conclude that the evidence presented by the Government was sufficient to support Paul's convictions for conspiracy to possess with intent to distribute cocaine.

In the taped telephone conversations, "Mike" gave Adam the telephone number and room number of Paul's hotel room at the French Quarter Courtyard Inn. When Adam called that number, Paul answered the telephone, discussed delivery of the cocaine, and obtained detailed directions to the ship's berth. Paul was then observed by Customs agents leaving the French Quarter hotel and traveling by taxi to the Days Inn on Williams Boulevard. Paul then called Adam at the public telephone near the ship's berth and told Adam that he would call back in about 45 minutes. Paul was subsequently arrested at his Days Inn motel room and found to be in possession of approximately $10,000 in cash and an address book containing directions to the ship's berth. It is reasonable for the jury to have concluded from this evidence that Paul agreed with "Mike" to possess the cocaine and that he voluntarily participated in the conspiracy by traveling to New Orleans, obtaining $10,000 in cash to pay Adam, and attempting to make arrangements to pick up the cocaine from Adam's ship.

6

Although he did not actually pick up the cocaine, his actions do not indicate that he refused to participate in the conspiracy or that he thwarted the conspiracy. Therefore, we affirm Paul's conviction for conspiracy to possess with intent to distribute cocaine.

Britton

The evidence is also sufficient to support Britton's conviction for conspiracy to possess with intent to distribute cocaine. Britton traveled to New Orleans on the same night that he went to Adam's ship. Britton called Adam shortly after arriving in New Orleans, identified himself as "P," and told Adam he would arrive at the ship in half an hour. "Mike" also called Adam, told him to deal with "P" instead of "Harry" and told Adam that "P" would arrive in a taxi. A short time later, Britton arrived at the ship in a taxi and handed a suitcase to Adam. Adam placed the substitute cocaine in the suitcase and handed it back to Britton. Britton took the suitcase loaded with substitute cocaine from Adam and drove away in the taxi. It was reasonable for the jury to conclude that the evidence presented by the Government established that Britton agreed with "Mike" to possess cocaine with intent to distribute and that he voluntarily participated in the conspiracy through the above actions. Therefore, we affirm Britton's conviction for conspiracy to possess with intent to distribute cocaine.

B.     Conspiracy to Import

To establish a conspiracy to import, the Government must prove that Paul and Britton agreed to import the cocaine into the United States and knowingly and voluntarily participated in the agreement. United States v. Obregon, 893 F.2d 1307, 1311 (11th Cir. 1990). Such an agreement may be proved by circumstantial evidence. Id. "The government provides sufficient proof of knowledge by demonstrating the conspirator knew of the essential purpose of the conspiracy," even

7

if he may not have known all of the relevant details.  Id.  "A conviction for the crime of importation of [a controlled substance] requires proof that the defendant knowingly played a role in bringing [the controlled substance] from a foreign country into the United States."  United States v. Diaz-Carreon, 915 F.2d 951, 953 (5th Cir. 1990).

We have never before decided whether facts of the type present in this case constitute evidence sufficient to support a conviction for conspiracy to import a controlled substance into the United States.  In a case involving much more probative evidence,  the First Circuit determined that such evidence was sufficient to support a conviction for conspiracy to import a controlled substance. United States v. Rengifo, 858 F.2d 800, 806-09 (1st Cir. 1988).  In Rengifo, the appellants argued that there was insufficient evidence to support their convictions for conspiracy to import cocaine into the United States.  Based on information from an informant that a vessel which had just arrived from Columbia was carrying cocaine, po lice set up surveillance of the vessel.  Id. at 802-03.  Police observed two men drive to the dock area several times.  Id. at 802.  Police also observed a second car drive to the dock area.  Id.  A few days later in the early morning, government agents observed two men darkly dressed move toward the bow of the vessel.  Id.  They were met by a crewman from the ship who handed them two duffel bags in exchange for a large white plastic bag.  Id. at 802-03. The two men then ran to another area of the dock.  Id. at 803.  Agents pursued the men and found them lying on their stomachs, crawling down an incline toward an opening in a fence.  Id.  About six feet away from the men, agents found two duffle bags containing over 55 kilograms of cocaine.  Id. Agents later discovered a white plastic bag on the vessel containing $89,610.  Id.

Agents had previously observed a second automobile drive to the vessel and then drive to the Howard Johnson Inn.  Id. at 802.  After agents arrested the two men at the vessel, they checked the

8

Howard Johnson Inn room register and found a room registered to a "Gonzalez." Id. They stationed agents at both doors to the room, called the room, and stated in Spanish that there had been problems at the vessel and told the men to leave the area. Id. Within a few seconds, the door opened and the men started to leave the hotel room. Id. Agents entered the room and arrested the three men in the room. Id. In the room, agents found a rental receipt for the rental car observed near the dock on the day the vessel arrived. Id. They also found two pieces of papers with letters in what appeared to be code which was later matched to codes on the packages of cocaine seized at the dock. Id. Agents also found another key to room 204. Id. at 803. In that room, agents found one piece of paper with a telephone number and "106" written on it and one piece of paper with a sketch of the dock area and the vessel. Id.

The First Circuit determined that the evidence was sufficient to support the convictions for conspiracy to import cocaine of the two men who were found crawling on their stomachs at the dock area within six feet of the two duffle bags containing the cocaine. Id. at 806-07. The First Circuit also determined that there was sufficient evidence to support the convictions of two of the men arrested in the hotel room because they were observed conducting surveillance of the ship area and circling the parking lot of the hotel apparently attempting to determining whether government agents were watching their activities. Id. at 807-08. They were also present in the hotel room when agents called and attempted to leave when they learned the other two men had been arrested at the vessel. Id. at 807-08. Further, Room 204 was registered to one of the men and contained a map of the dock area and the ship. Id. at 807. The court determined that there was sufficient evidence to support the convictions of two of the men arrested in the hotel room. Id. at 807-09.

9

In contrast to the detailed and illuminating facts of the Rengifo case, the evidence is not sufficient to support either defendants' conviction for conspiracy to import cocaine into the United States. The evidence established that "Mike" contacted Paul and Britton concerning delivery of the cocaine after the vessel carrying the cocaine reached the United States. However, despite Paul's possession of $10,000 and directions to the ship and Britton's actually going to the vessel, the evidence did not clearly establish that Paul and Britton agreed to participate in and played a role in bringing the cocaine into the United States. There is no proof that either defendant was even aware of the shipment's existence until "Mike" called them to retrieve it. Therefore, we reverse the defendants' convictions on this count.

II.     Britton's Motion to Suppress

Pursuant to Rule 404(b) of the Federal Rules of Evidence, the Government gave notice that it would seek to introduce evidence of similar acts committed by Britton. The evidence involved a January 1996 incident in which a large sum of United States currency and a suitcase with a false bottom were seized from Britton (who was then traveling under an assumed name with false identity documents) at the Baltimore-Washington International Airport. Britton moved to exclude the governments's 404(b) evidence. At a pretrial hearing, the district court ruled that the 404(b) evidence would be admitted. However, the trial court did agree to conduct a "suppression" hearing to determine whether the defendant's constitutional rights had been violated during the airport stop that was the subject of the government's 404(b) evidence.

We will not reverse the district court's decision to admit Rule 404(b) evidence absent an abuse of discretion. United States v. Zanabria, 74 F.3d 590, 592 (5th Cir. 1996). However, our

10

determination of whether the district court abused its discretion necessitates an examination of the issues involved in the pretrial suppression hearing that was conducted by the district court.

At the hearing, the Government presented the testimony of Michael Bolewicki, a police officer with the Department of Maryland Natural Resources. Bolewicki testified that he was told by the airport security officers that an individual was stopped when he tried to pass an airport screening point with a large sum of money. Bolewicki also testified that Britton was the individual who was stopped and that Britton produced a passport with the name Gary Louis Ellis. Bolewicki further testified that Britton had bundles of money totaling $38,000 and clothes in a false compartment of a suitcase and a duffle bag. Bolewicki questioned Britton concerning his travel plans. Britton told Bolewicki that he had purchased a one-way cash ticket to New York and that he was carrying the money to buy clothes. Britton told Bolewicki that he planned to bring the clothes back to Washington, D.C. Britton also told Bolewicki that he had traveled to New York to purchase clothes three or four times. Britton told Bolewicki that a friend was going to help him transport the clothes from Washington to Baltimore, but Britton could not remember the friend's name. Britton was unable to give Bolewicki the names of the companies or people from whom he bought clothes in New York. Britton stated that his annual income was $12,000. He further stated that he did not have a business license.

Bolewicki testified that he told Britton that he was not under arrest and that he was free to leave. Britton consented to a search of his bags. Britton stated that he had $300 in cash on his person but Bolewicki found $1000 on Britton's person. Britton also had a Maryland driver's license and a Florida identification card with the name Gary Louis Ellis. However, Britton had previously

11

failed to give Bolewicki a driver's license. Bolewicki testified that police conducted a K-9 scan of the money and bag for drugs and both tested positive for drugs.[1]

On cross-examination, Bolewicki testified that when he arrived, Britton was in a room with one police officer who was not in uniform. Bolewicki testified that he was not in uniform either. Bolewicki testified that he asked Britton the questions that he generally asks when he stops suspected drug couriers.

Based on the testimony presented at the hearing, the district court determined that there was no custodial interrogation requiring that Britton be given Miranda warnings. The district court reasoned that the questioning was somewhat analogous to a general inquiry made during a stop-and-frisk situation under Terry v. Ohio.[2] The trial court did, however, agree to give a limiting instruction before the testimony was elicited from Bolewicki, in open court.

Britton maintains that the airport stop and subsequent questioning by police officers in a private office at the airport constituted custodial interrogation requiring that he receive Miranda[3] warnings. Britton argues that because he did not receive Miranda warnings his statements were obtained in violation of his Fifth Amendment rights and should have been suppressed.

Miranda warnings must be given prior to custodial interrogation. United States v. Pofahl, 990 F.2d 1456, 1487 (5th Cir. 1993). The issue of whether an interrogation is custodial has been treated by this Court as a legal question subject to de novo review. See United States v. Collins, 972 F.2d

---

[1] Bolewicki also testified that an ion test was conducted on the bag and the results were positive for drugs. However, the district court subsequently ruled that Bolewicki was not qualified to testify concerning the ion test.

[2] 392 U.S. 1, 27 (1968).

[3] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

12

1385, 1404-06 (5th Cir. 1992). "A suspect is . . . `in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988)(en banc).

There is conflicting evidence concerning whether Britton was free to leave during the time that he was being questioned. Although Bolewicki testified that he advised Britton he was free to leave, Britton argues that the police report states that Britton was not advised that he was free to leave until after he was questioned.

It is, however, unnecessary for us to determine whether Britton was actually in custody. Assuming, arguendo, that Britton was questioned in violation of his Miranda rights, "violations of *Miranda*'s teachings may fall within the purview of the harmless error rubric." United States v. Baldwin, 691 F.2d 718, 723 (5th Cir. 1982). This Court determines whether "absent the . . . unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelmingly so as to establish the guilt of the accused beyond a reasonable doubt." Id. at 723-24 (internal quotations and citation omitted). The admission of Britton's statements regarding the unrelated airport stop, even if error, was harmless error because as discussed above there was overwhelming independent evidence of Britton's guilt. Id. at 724. The evidence, including the taped telephone conversations, as well as the testimony of the undercover Customs Agent Orate and Adam, established that Britton participated in the conspiracy by traveling to New Orleans and going to the ship's berth to pick up the cocaine. Therefore, even if the admission of Britton's statements during the airport stop was error, the error was harmless.

13

Given that the district court's failure to suppress evidence of the airport stop was, at worse, harmless error, it is apparent that the district court did not abuse its discretion in denying Britton's motion to exclude the Government's 404(b) evidence at trial.

III.     Britton's Motion for a Mistrial

During the trial, U.S. Customs Agent Denise Weber testified that a cellular telephone seized from Britton at the time of his arrest was a cloned cellular telephone.  However, Agent Webber acknowledged that the telephone was not used in connection with the instant conspiracy.  At the close of the evidence, Britton's counsel moved for a mistrial on the grounds that Agent Weber's testimony improperly placed evidence of "other crimes" before the jury.  This evidence, Britton argues, had no probative value and was highly prejudicial as it reflected adversely on his character.  The motion for mistrial was denied by the district court.  The district court further determined that a specific curative instruction should not be given because it would merely call further attention to the evidence.

A district court's refusal to grant a mistrial based on the admission of prejudicial evidence is reviewed for an abuse of discretion.  United States v. Limones, 8 F.3d 1004, 1007 (5th Cir. 1993).  If the motion for mistrial involves the presentation of prejudicial testimony before a jury, a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record.  Id. at 1007-08.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  Fed. R. Evid. 404(b).  An inherent danger in admitting evidence of other acts is that the jury might convict the defendant for the extrinsic offense rather than for the offense charged.  United States v. Ridlehuber, 11 F.3d 516, 521 (5th Cir. 1993).

14

Britton has not shown that the district court's decision not to grant a mistrial was an abuse of discretion. Agent Webber's references to stolen cellular telephone services and to "hijacked" calls were isolated remarks that were not dwelled upon by the parties. Further, neither party referred to the stolen telephone services in their closing arguments.

In denying Britton's motion for a mistrial, the district court stated:

> It seems to me that it was said in such a quick, quick blush that any attempt to cure this by the Court would just call further attention to something that I am positive, in my opinion, looking at the Jury at the moment that it happened, no one either heard or appreciated it at the time it was given.
>
> I will not allow any argument, however. I think the safest way to cure that situation is not to allow any argument on that particular situation during closing arguments. Even if it is considered to be intrinsic evidence, which I don't suggest it is or it isn't, because it really is not particularly germane, I don't really believe it was other crimes of [sic] evidence. I don't see it being in the same nature as relating to some other type of crime for which the only alternative would be a mistrial situation, and, again, at the time it was given and in the manner given, I don't perceive it to be a situation where a mandatory mistrial is required.
>
> You cleared it up, in fact, to a certain extent, when you talked about those records don't even show any phone calls. So I don't really appreciate this as being a mistrial situation, but your request is certainly noted.

Although the district court did not give a specific curative instruction concerning the reference to the stolen telephone services, the district court did generally instruct the jury that "the Defendants are not on trial for any act or conduct not alleged against him [sic] in the indictment." This Court has consistently held that an erroneous admission of evidence may be cured by such a limiting instruction because jurors are presumed to follow the court's instructions. See United States v. Scott, 48 F.3d

15

1389, 1396-97 (5th Cir. 1995); United States v. Evans, 572 F.2d 455, 484 (5th Cir. 1978). Even if the admission of the testimony concerning the stolen telephone services was error, there is not a significant possibility that it had a substantial impact on the jury's verdict in light of the other overwhelming evidence of Britton's guilt presented at trial as discussed above. See Limones, 8 F.3d at 1008. Therefore, even if the admission of the testimony was error, we do not find that a new trial is required. Id.

CONCLUSION

For the forgoing reasons, we affirm the defendants' convictions of conspiracy to possess with the intent to distribute cocaine hydrochloride in violation of 21 U.S.C. §§ 841(a)(1) and 846. We reverse the defendants' convictions of conspiracy to import cocaine hydrochloride into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 963.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's decision to affirm Paul's and Britton's convictions for conspiracy to possess with intent to distribute cocaine. I disagree, however, with that portion of the majority's opinion that reverses the defendants' convictions for conspiracy to import cocaine. Instead, I believe that the evidence more than supports the jury's conclusion that Paul and Britton participated in a conspiracy to import cocaine. Accordingly, I respectfully dissent from the majority's contrary conclusion.

As the majority notes at the outset, in a challenge to the sufficiency of the evidence, we must affirm the jury's verdict "if

-16-

*any* reasonable trier of fact *could have found* that the evidence presented at trial establishes the essential elements of the crime beyond a reasonable doubt." *See ante* at 4 (emphasis added); *see also United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996). The majority also acknowledges that "'[t]he jury may infer any element of this offense from circumstantial evidence.'" *See ante* at 5 (quoting *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989)). Significantly for the facts of this case, "an agreement may be inferred from concert of action, voluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances." *Lechuga*, 888 F.2d at 1476-77. Moreover, we view sufficiency of the evidence challenges in the light most favorable to the verdict. *See Alix*, 86 F.3d at 435.

In the case at hand, there is ample evidence))both direct and circumstantial))from which the jury could infer an agreement to import cocaine. The undisputed evidence indicates that "Mike" placed a large quantity of cocaine on board a ship in Guyana and asked Adam to help him smuggle the cocaine into the United States. "Mike" also explained that someone would come to take delivery of the cocaine (*i.e.*, complete the importation) once the vessel arrived in New Orleans. During the course of their numerous telephone conversations (recorded by the Customs agents and presented to the jury), "Mike" gave Adam the names (or codenames)

-17-

of his couriers (Britton and Paul), how to reach them, when to reach them, and the various plans for delivering the cocaine. The evidence is undisputed that all of Adam's information and directions for delivering the cocaine came from "Mike," that Britton and Paul were specifically designated by "Mike" (through their code names) to take delivery and/or pay for the cocaine, that "Mike" was the only connection between Adam and the two defendants, and that "Mike" contacted Britton and Paul from Guyana to arrange for the pickup of the cocaine in New Orleans.

In addition, there was specific evidence (in a recorded conversation) that "Mike" told Adam that he contacted a courier named "Harry" (whose real name, he disclosed, was Gavin Paul) who would fly from New York to pick up the cocaine in New Orleans. The evidence confirms that Paul did fly from New York to New Orleans and that Paul was at the phone number given to Adam by "Mike" (at the French Quarter Courtyard Inn). Furthermore, when the police arrested Paul, he had directions to the ship's berth and $10,000 in cash. With regard to the conspiracy to possess with intent to distribute charge, the majority notes that Paul's actions "do not indicate that he refused to participate in the conspiracy." *See ante* at 6. This same conclusion))that Paul continued to participate in the conspiracy))applies equally to the conspiracy to import charge.

-18-

Similarly, when the plans changed, "Mike" told Adam that "he had another man in town who would pick up the cocaine," namely Britton. *See ante* at 3. The evidence confirms that Britton traveled to New Orleans on the same night that he went to Adam's ship and that he called Adam to say that he would arrive at the ship in half an hour to pick up the cocaine. Again, it was "Mike" (in Guyana) who called Adam and told him that he should deal with Britton instead of Paul; that Britton would arrive at the docks by taxi to pick up the cocaine; and that Paul would deliver the money. Shortly after this call, Britton arrived at the docks in a taxi and picked up the cocaine from Adam (without paying for it). Given the detailed and highly coordinated level of concert between Britton and Paul on one hand, and "Mike" in Guyana on the other, and the fact that the jury can infer any element of the crime from circumstantial evidence, it is eminently reasonable for the jury to conclude that Britton and Paul participated in the conspiracy to import cocaine into the United States. Moreover, in light of our standard of review for challenges to the sufficiency of the evidence, I am unable to agree with the majority that *no* reasonable trier of fact could have inferred a conspiracy to import the cocaine.

The majority appears to base its conclusion on the fact that "Mike" contacted Britton and Paul "after the vessel carrying the cocaine reached the United States" and that "[t]here is no proof

-19-

that either defendant was even aware of the shipment's existence until 'Mike' called them to retrieve it." *See ante* at 10. This decision ignores the well-established fact that "[t]he government need not prove that each alleged conspirator knew all the details of the conspiracy [and that] [t]he government provides sufficient proof of knowledge by demonstrating the conspirator knew of the essential purpose of the conspiracy." *United States v. Obregon*, 893 F.2d 1307, 1311 (11th Cir. 1990). The majority's reversal of Paul's and Britton's convictions for conspiracy to import also implies that Britton's actions in meeting Adam at the docks and receiving the cocaine from the ship, Paul's concerted actions preparing for the payment of the cocaine, and both of their communications with "Mike" in Guyana are not circumstantial evidence of the conspiracy to import the cocaine. I respectfully disagree. *See Obregon*, 893 F.2d at 1311 (explaining that "[t]he government may prove [] an agreement by circumstantial evidence, through 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme'") (quoting *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir. 1982)).

Moreover, I disagree with the majority that *United States v. Rengifo*, 858 F.2d 800, 807 (1st Cir. 1988), presents a case involving "much more probative evidence." *See ante* at 8. Instead, under very similar facts, the First Circuit found sufficient evidence to affirm the convictions of five defendants for

conspiracy to import cocaine.  *See Rengifo*, 858 F.2d at 807 (finding that the defendants were guilty of conspiracy to import cocaine by "prepar[ing] a plan for offloading the cocaine [from the ship]").  The majority offers no factors distinguishing the case at hand from *Rengifo*, and I, likewise, can surmise none.

The five defendants in *Rengifo* were convicted of conspiring to import cocaine after two of the defendants were apprehended shortly after taking delivery of the cocaine from a ship at its berth in Rhode Island.  The First Circuit held that the action of the two defendants in retrieving the cocaine from the ship, together with the concerted planning of the three defendants who remained at a local hotel room, was sufficient for the jury to reasonably infer a conspiracy to import cocaine among all of the defendants.  Our facts are indistinguishable from those of *Rengifo*, and, if anything, given the level of concerted action between "Mike," Britton, and Paul, provide greater evidence that Britton and Paul were coordinating their activity with "Mike" in Guyana.

In *Rengifo*, the court summarized the evidence deemed sufficient to support the importation charge for the two defendants apprehended at the docks:

> Government agents observed two suspects dressed in black receiving a duffel bag from a ship which the agents reasonably believed contained cocaine. . . .  The agents observed the two suspects running into the tank farm area of the docks.  Five to ten minutes later Sigifredo and Rengifo were apprehended in that area, dressed in black and crawling on their stomachs toward a hole in a fence. Fifteen feet from Sigifredo and six feet from Rengifo

> were two duffel bags containing 55 kilograms of cocaine. *This evidence alone was sufficient to convict Sigifredo of both importation* and possession with intent to distribute the cocaine.

*Rengifo*, 858 F.2d at 806 (emphasis added). As the First Circuit's opinion clearly demonstrates, it is the two defendants' action in retrieving the cocaine from the ship that is sufficient to convict them of conspiracy to import. There is no discussion about the defendants' knowledge of the cocaine's origin, who put it on the ship, or their participation in getting it across the ocean. Significantly, the actions of the two defendants in *Rengifo* are nearly identical to those of Britton in this case.

In addition, with regards to the remaining three defendants in *Rengifo,* the court confronted a situation analogous to that of Paul in the case at hand. Because only two of the defendants in *Rengifo* were caught near the docks with possession of the cocaine, and the remaining defendants were arrested miles from the ship at their hotel, it was necessary to link the remaining defendants to the conspiracy to import cocaine. Noting that the jury is entitled to make reasonable inferences from circumstantial evidence, the First Circuit concluded that sufficient evidence supported the conviction of each of the three remaining defendants. *See id.* at 807-08 (concluding that evidence was sufficient to support conviction for conspiracy to import cocaine because "the jury could have concluded that [the defendant] was aware of the activities of [the other defendants] at the ship, and that he was hurriedly leaving the

[hotel] room because he also feared being caught due to his involvement in the conspiracy"); *see also Obregon*, 893 F.2d at 1311 ("A person may also be found guilty of a conspiracy 'even if he plays only a minor role in the total scheme.'") (quoting *Tamargo*, 672 F.2d at 889).

The court in *Rengifo* clarified that a defendant does not have to participate in the physical removal of cocaine from the ship in order to be convicted of *conspiracy* to import cocaine (as opposed to actual importation). The court explained as follows:

> No evidence was presented that any of the defendants arrested in room 106 ever possessed the cocaine. We note as a preliminary matter, however, that a coconspirator is responsible for the substantive offenses committed in furtherance of the conspiracy regardless of whether he participates in, or even has knowledge of, those offenses. Therefore, the government needed to show only continuing participation by [the remaining defendants] in the conspiracy to import and possess with intent to distribute in order to satisfy its burden regarding their participation and the substantive offenses.

*Rengifo*, 858 F.2d at 807 (citation omitted). Contrary to the unsupported assertion by the majority, I do not find the facts of *Rengifo* distinguishable from the case at hand in any meaningful way. The detailed facts given in *Rengifo* relate to whether the defendants were involved with the cocaine delivery *at all*))a question that the majority already answers in the affirmative for Britton and Paul.

Significantly, Britton's only argument against the conspiracy to import charge is that there is no evidence establishing any

nexus between "Mike" and him or Paul and him. This plainly ignores the extensive evidence of concerted action between the defendants and "Mike," as well as the fact that the jury can infer any element of the conspiracy from circumstantial evidence and the parties' concerted action. Moreover, the majority has already rejected Britton's claim that he was not part of any conspiracy with Paul, "Mike," and Adam. *See ante* at 7 (cataloguing Britton's concerted actions in relation to the conspiracy to possess charge). There is substantial evidence that would lead a reasonable jury to conclude that Britton coordinated with "Mike" in Guyana because he knew that the cocaine was on the ship, called Adam at a particular pay phone at a particular time, and took delivery of the cocaine without having to pay for it.

Similarly, Paul's sole claim regarding the sufficiency of the evidence is that his refusal to deliver the $10,000 "evidenced his unwillingness to join the conspiracy." Paul's argument does not refute the notion that there was a conspiracy, nor that he and Britton coordinated their planned payment for and retrieval of the cocaine from the ship with "Mike." To the contrary, Paul merely argues that he "withdrew" from the conspiracy))an argument the majority correctly rejects.

As the majority correctly sets forth, "[t]he jury may infer any element of [the conspiracy] offense." *Lechuga*, 888 F.2d at 1476. Nonetheless, in reversing the jury's conclusion under the

facts of this case, the majority ignores this fundamental principle. In the case at hand, given: (1) the extraordinary degree of "concerted action" between "Mike" in Guyana and the defendants, Britton and Paul, (2) the fact that Paul was arrested with $10,000 in cash and directions to the ship's berth, and (3) the fact that Britton did not pay for the cocaine and retrieved the cocaine directly from Adam at the docks, I disagree with the majority's holding that no reasonable jury could find a conspiracy to import cocaine. For the foregoing reasons, I dissent.