# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20307

United States Court of Appeals
Fifth Circuit

**FILED**
June 28, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

SANTOS ALFONSO ZAMORA-SALAZAR,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and WIENER and PRADO, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendant-Appellant Santos Alfonso Zamora-Salazar appeals his convictions for conspiracy to import and importation of methamphetamine. He also appeals the sentencing enhancement imposed by the district court. For the following reasons, we affirm the convictions and sentence.

## I.    Facts & Procedural History

After being taken into federal custody on April 6, 2015, Zamora-Salazar was charged, along with Mario Cruz-Becerra, with conspiring to import methamphetamine[1] and aiding and abetting importation of

---

[1] 21 U.S.C. §§ 963, 952(a), 960(a)(1), and 960(b)(1).

methamphetamine.[2] Zamora-Salazar was also charged with being an illegal alien in possession of a firearm.[3] A three-day jury trial was held and Cruz-Becerra cooperated with the Government, providing trial testimony as to the events that occurred giving rise to the charged offenses.

Cruz-Becerra testified that he had an agreement with his cousin Victor Becerra, who lives in Mexico, to receive packages containing drugs at his residential address in Texas. In early April 2015, Victor sent the first package from Mexico to Cruz-Becerra via FedEx. The package contained a water cooler with methamphetamine packed inside the compressor. Once Victor sent the package, he messaged Cruz-Becerra to let him know that it was on the way.[4] When the package arrived, Cruz-Becerra sent a message to Victor confirming receipt but did not open the package even though it was addressed to him. Victor replied that he would send "someone" to retrieve the package and that person would arrive in approximately half an hour. A half hour later, Zamora-Salazar and his half-brother Constancio Diaz Salazar ("Diaz") showed up at Cruz-Becerra's residence in an Escalade; Zamora-Salazar was driving.[5] When they arrived, Diaz asked Cruz-Becerra if he was Victor's cousin. Cruz-Becerra answered "yes." Cruz-Becerra and Diaz then loaded the package displaying a shipping label from Mexico[6] in the Escalade and Zamora-Salazar and Diaz left.

A week later, Victor sent Cruz-Becerra a second package from Mexico via UPS that contained an AC unit. When the package arrived at the port of entry in Laredo, Texas, it was sent for a secondary inspection. It was there

---

[2] 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(1); 18 U.S.C. § 2.

[3] 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

[4] Cruz-Becerra and Victor used "WhatsApp" to communicate about the packages.

[5] Cruz-Becerra agreed on cross-examination that he assumed that Victor directed the men to "come get" the packages.

[6] The record indicates that federal agents never recovered the FedEx package but they obtained a copy of the original mailing label through a subpoena issued to FedEx.

that federal agents discovered approximately six kilograms of methamphetamine inside the AC unit's compressor. The agents replaced the drugs inside the compressor with dirt, reassembled the AC unit with a GPS tracker, put a trip wire inside the unit that would notify them if it was opened, placed the unit back inside the original packaging, and put a layer of cellophane around the box. A federal agent disguised as a UPS driver then made a controlled delivery of the package to Cruz-Becerra's residence. When Cruz-Becerra arrived home, he messaged Victor to confirm receipt of the package and again did not open the package that was addressed to him. Victor replied that he would send "someone" to retrieve the package in approximately thirty minutes. A half hour later, Zamora-Salazar and Diaz arrived at Cruz-Becerra's residence in the same Escalade they had driven to retrieve the FedEx package Victor had sent from Mexico a week earlier.[7] The two men exited the vehicle, Zamora-Salazar opened the tailgate,[8] Cruz-Becerra and Diaz loaded the UPS package displaying a mailing label from Mexico in the bed of the vehicle, and Zamora-Salazar and Diaz drove away.

Federal law enforcement tailed Zamora-Salazar and Diaz via helicopter and ground vehicle as they drove back to their residence which was approximately four to six miles away. When the two men arrived home a short while later, they exited the Escalade, removed the cellophane from the UPS package, and then suddenly pointed at the helicopter, indicating that they had noticed the presence of law enforcement. Zamora-Salazar went inside the house and shortly thereafter fled the property. Zamora-Salazar's wife Samantha consented to a search of the residence, where federal agents found

---

[7] When testifying at trial, Cruz-Becerra identified Zamora-Salazar as the person driving the Escalade by pointing to him.

[8] Although there is some discrepancy in the trial transcript, it appears that Zamora-Salazar exited the vehicle for the limited purpose of opening the tailgate for Diaz and Cruz-Becerra to place the UPS package inside of the bed of the Escalade.

methamphetamine crumbs near the toilet and a loaded sawed-off shotgun in Zamora-Salazar's bedroom.

Zamora-Salazar attempted to hide inside of a neighbor's car, but the neighbor alerted law enforcement of his location. Zamora-Salazar was arrested and Mirandized. Once he was in custody, Zamora-Salazar stated to federal authorities that he was "not the main person involved" and that he reported to a person named "Big Z." He also acknowledged post-arrest that he had known that the AC unit had contained methamphetamine.

A three-day jury trial was held and, at the close of the Government's case and at the close of the evidence, Zamora-Salazar moved for a judgment of acquittal which was overruled. Zamora-Salazar was convicted of conspiracy to import 500 grams or more of methamphetamine,[9] aiding and abetting the importation of 500 grams or more of methamphetamine,[10] and being an illegal alien in possession of a firearm.[11]

The presentence report ("PSR") grouped the importation counts together and assessed a combined total offense level of 42. Included in this calculation was a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1 cmt. n.4(A). The PSR based the enhancement on the contents of the Government's pretrial notice of its intent to introduce evidence of other crimes, wrongs, or acts. FED. R. EVID. 404(b). In this notice, the Government stated that "[o]n or about May 13, 2015, Zamora-Salazar and Cruz-Becerra were arraigned before Magistrate Judge Nancy Johnson. While in the holding cell at the U.S. Federal Courthouse, Zamora-Salazar threatened Cruz-Becerra by asking him whether he knew what happened to the family members of individuals who 'talk.'"

---

[9] 21 U.S.C. §§ 963, 952(a), 960(a)(1) and 960(b)(1).

[10] 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(1); 18 U.S.C. § 2.

[11] 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Zamora-Salazar does not appeal his conviction on this count.

Defense counsel objected to the enhancement, stating Zamora-Salazar denied making the statement reported in the PSR. A trial transcript was not available at sentencing and defense counsel proffered that Cruz-Becerra testified that Zamora-Salazar said to him "Do you know what you're doing? There could be problems later on."[12] The district court interjected, stating "[w]e can go get a transcript, but let's assume that's as close as we can, and I kind of remember it generally." Defense counsel continued and argued that the statement should not be interpreted as a threat. The Government argued in response that the statement was meant to intimidate Cruz-Becerra "into not cooperating with the [G]overnment and testifying against him." The district court responded by stating that "I might say also just for the record, I was here and I listened to the entire trial. In fact, that—I believe that was the statement made in the presentence report that the judge, you know, was here at the time." The district court overruled the objection to the enhancement.

Zamora-Salazar's total offense level of 42, coupled with a criminal history category of II, yielded an advisory Guidelines range of 360 months to life imprisonment. The district court sentenced Zamora-Salazar to a term of 360 months of imprisonment and five years of supervised release. This appeal ensued.

## II.     Discussion

On appeal, Zamora-Salazar first argues that there was insufficient evidence presented at trial to support his convictions for conspiracy to import and importation of methamphetamine. He also argues that the district court

---

[12] The trial transcript reflects that when Cruz-Becerra was asked on the stand, while in the presence of Zamora-Salazar, to testify as to the statements Zamora-Salazar made to him outside of the courthouse, Cruz-Becerra replied that Zamora-Salazar had asked him: "[a]bout did I know what I was doing" and "[a]bout how there could be problems later on."

erred in imposing the two-level sentencing enhancement for obstruction of justice. We address each argument in turn.

*A. Conspiracy to Import and Importation*

This court conducts a de novo review of "a district court's denial of a post-trial motion for a judgment of acquittal." *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017). Moving for a judgment of acquittal is considered to be a challenge to the sufficiency of the evidence. *Id.* The jury's verdict is afforded "great deference" on appeal. *Id.* In determining whether the evidence was sufficient to support the conviction, the question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Given this court's highly deferential standard of review, the "inquiry is 'limited to whether the jury's verdict was reasonable, not whether we believe it to be correct.'" *United States v. Gulley*, 526 F.3d 809, 816 (5th Cir. 2008) (per curiam) (quoting *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)).

To uphold the conviction, there is no requirement that the evidence exclude every possible "hypothesis of innocence." *Lopez-Monzon*, 850 F.3d at 206. "A jury is free to choose among reasonable constructions of the evidence." *Id.* The reviewing court only ascertains whether the jury made a "rational decision," not "whether the jury correctly determined guilt or innocence." *Id.* Credibility choices that support the jury's verdict must be accepted and it is not within this court's province on appeal to reweigh the evidence. *United States v. Castaneda*, 548 F. App'x 140, 142–43 (5th Cir. 2013) (per curiam) (citation omitted). If the jury was presented with sufficient evidence to support its verdict, the verdict must be upheld. *Lopez-Monzon*, 850 F.3d at 206.

No. 16-20307

Count 1 – Conspiracy to Import Methamphetamine[13]

To prove conspiracy to import drugs, the Government must establish that a defendant agreed to import drugs and knowingly and voluntarily participated in the agreement. *United States v. Paul*, 142 F.3d 836, 841 (5th Cir. 1998). "The jury may infer any element of [conspiracy] from circumstantial evidence." *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989). A defendant's agreement may be "inferred from concert of action," his "voluntary participation may be inferred from a collocation of circumstances," and his "knowledge may be inferred from surrounding circumstances." *Id.* at 1476–77 (internal quotation marks omitted). Although a defendant's participation in a conspiracy must be voluntary to support a guilty verdict, his personal role can be minor. *Id.* at 1477.

Count 2 – Aiding and Abetting the Importation of Methamphetamine[14]

To support a conviction for the crime of importation of a controlled substance, the Government must establish that: "(1) the defendant played a role in bringing a quantity of a controlled substance into the United States from outside of the country; (2) the defendant knew the substance was controlled; and (3) the defendant knew the substance would enter the United States." *Lopez-Monzon*, 850 F.3d at 206 (quoting *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999)). To prove aiding and abetting the importation of drugs, the Government must establish that the defendant associated with the criminal venture, purposefully participated in the crime, and sought to make it successful. *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007).

---

[13] 21 U.S.C. §§ 963, 952(a), 960(a)(1), and 960(b)(1).
[14] 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(1); 18 U.S.C. § 2.

No. 16-20307

Zamora-Salazar argues that the evidence was insufficient to support both importation convictions because the Government failed to prove beyond a reasonable doubt that he "entered an agreement to import, had knowledge of the importation, played any role in the importation, shared the criminal intent to import, or took some step to aid in the importation." He argues that, while the evidence showed that he and Diaz rode to pick up two packages of methamphetamine after they had arrived in the United States, no evidence showed that he knew the packages came from outside the United States or that he had any role in bringing the packages into the United States. Citing *Paul*,[15] Zamora-Salazar argues that his involvement with the methamphetamine occurred after it arrived in the United States. For the reasons that follow, these arguments fail.

A review of the record reveals that sufficient evidence was presented at trial to support Zamora-Salazar's convictions of conspiracy to import methamphetamine and importation of methamphetamine. As the Government correctly points out, the timing and circumstances of the drug shipments show a "concert of action" supporting the jury's conclusion that Zamora-Salazar knowingly and voluntarily participated in an agreement to import drugs. *Lechuga*, 888 F.2d at 1476–77. It is undisputed that Cruz-Becerra and his cousin Victor had an agreement that Victor would ship packages containing methamphetamine from Mexico to Cruz-Becerra's home address in the United States. Each time a package arrived to Cruz-Becerra's home, he did not open it even though it was addressed to him. Instead, he alerted Victor of the package's arrival and Victor replied that "someone" would be there in about a half hour to retrieve the drugs. Both times, Zamora-Salazar showed up to Cruz-Becerra's home within the timeframe designated by Victor

---

[15] 142 F.3d at 842.

to pick up the packages. Furthermore, when Zamora-Salazar and Diaz arrived to retrieve the first package with the water cooler inside, Diaz asked Cruz-Becerra if he was Victor's cousin, a further indication that the men had likely directly communicated with Victor.[16]

Aside from evidence supporting the jury's inference that Zamora-Salazar and Diaz communicated with Victor about the drug shipments, the packages themselves both displayed shipping labels from Mexico. The FedEx package with the water cooler inside displayed a shipping label from Mexico.[17] It could be reasonably inferred that Zamora-Salazar would have expected the second package also to be from Mexico. Aside from that inference, the fact that the second package was from Mexico would have been definitively revealed to him when he opened the back of his Escalade, watched the package being placed in the bed of the vehicle, and saw that it also had a shipping label from Mexico.

Finally, Zamora-Salazar admitted after he was apprehended and in federal custody that he was "not the main person involved," that he reported to a person by the name of "Big Z," and that he knew that the AC unit had contained methamphetamine. These admissions indicate that Zamora-Salazar

---

[16] Citing this court's opinion in *United States v. Campos*, No. 92-4573, 1994 WL 144866, at *9 (5th Cir. Apr. 14, 1994), Zamora-Salazar argues that any knowledge that Diaz had about Victor cannot be imputed to himself. While it is true that this court will not impute Diaz's knowledge of Victor to Zamora-Salazar, a reasonable jury could nevertheless infer that Zamora-Salazar would not drive himself and Diaz to Cruz-Becerra's home to pick up a package without any knowledge of where the package came from or who shipped the package. That Diaz confirmed Victor's identity with Cruz-Becerra after the two men arrived to pick up the first drug shipment merely strengthens the reasonableness of the inference. Moreover, this conclusion is supported by Cruz-Becerra's testimony at trial that the three men only briefly greeted one another and did not discuss any details regarding the packages during either pick-up, suggesting that Zamora-Salazar and Diaz already knew who sent the packages and where they came from prior to their arrival. *See Lechuga*, 888 F.2d at 1476–77 (noting that a defendant's "knowledge may be inferred from surrounding circumstances").

[17] According to the records subpoenaed from FedEx by the Government, the shipping label on the package not only reflected an origin of Mexico but the surrounding language on the package was also in Spanish.

knowingly and voluntarily chose to participate in a larger scheme involving others for the purpose of importing drugs. *See Lechuga*, 888 F.2d at 1477 (observing that a defendant's participation in a conspiracy must be voluntary to support a guilty verdict but his personal role can be minor). Accordingly, a rational jury could infer from this evidence that Zamora-Salazar conspired to import methamphetamine into the United States. *Paul*, 142 F.3d at 841 (explaining that, to prove conspiracy to import drugs, the Government must establish that a defendant agreed to import drugs and knowingly and voluntarily participated in the agreement).

This evidence also supports Zamora-Salazar's conviction of importation of methamphetamine on grounds that: (1) he played a role in bringing controlled substances into the United States from outside the country; (2) he knew that the substances were controlled; and (3) he knew the drugs would enter the United States. *Lopez-Monzon*, 850 F.3d at 206. First, Zamora-Salazar's role in bringing the controlled substances into the United States was clear: he personally retrieved the drugs each time they were shipped directly from Mexico to Cruz-Becerra's residence in Texas. The evidence supports that Zamora-Salazar was an intended recipient of the drug shipments because Cruz-Becerra allowed each of the unopened packages to be placed in the bed of the Escalade Zamora-Salazar was driving, even though Cruz-Becerra's name and address were on the mailing labels. Second, Zamora-Salazar conceded post-arrest that he knew the package with the AC unit had contained methamphetamine, a controlled substance. Third, Zamora-Salazar arrived at Cruz-Becerra's Texas residence to pick up each drug shipment within the limited timeframe designated by Victor, indicating that he had communicated with the person who had shipped the drugs from Mexico and knew prior to the arrival of the shipments that the drugs would enter the United States. Moreover, each drug shipment displayed a mailing label from Mexico. For the

reasons discussed above, this evidence equally supports a reasonable inference that Zamora-Salazar associated with the criminal venture, purposefully participated in the crime, and sought to make it successful. *Pando Franco*, 503 F.3d at 394.

Zamora-Salazar's reliance on *Paul* is misplaced. In *Paul*, the evidence established that a smuggler placed a quantity of cocaine aboard a vessel while it was docked in Guyana and, several days after the vessel reached the United States, contacted the defendants to retrieve the drugs. 142 F.3d at 838, 842. One defendant went to the ship to retrieve the cocaine and the other defendant did not, although that defendant was ultimately found with directions to the ship and $10,000. *Id.* at 842. This court reversed the defendants' convictions for conspiracy to import cocaine on grounds that "the evidence did not clearly establish that [the defendants] agreed to participate in and played a role in bringing the cocaine into the United States." *Id.* at 842 (reasoning that there was "no proof that either defendant was even aware of the shipment's existence until [they were called] to retrieve it").

Zamora-Salazar argues that, like the defendants in *Paul*, the evidence presented at trial showed that his involvement with the methamphetamine occurred after it arrived in the United States. This argument falls short for several reasons. Unlike the *Paul* defendants, Zamora-Salazar was put on notice that he was retrieving drugs that were being imported into the United States when he picked up the first package containing methamphetamine in a water cooler that displayed a shipping label from Mexico. Zamora-Salazar had a second opportunity to observe the foreign origin of the drugs when he was at Cruz-Becerra's home a week later and again saw that the package containing the AC unit displayed a shipping label from Mexico. Additionally, unlike the *Paul* defendants, the record evidence here supports the conclusion that Zamora-Salazar and Diaz were in prior contact with the person shipping the

drugs from a foreign country and had knowledge that the drug shipments would be arriving prior to their delivery at Cruz-Becerra's residence.[18] Further, unlike the *Paul* defendants, the evidence suggests that Zamora-Salazar was an intended recipient of the shipments from Mexico, rather than Cruz-Becerra, since he retrieved each package within thirty minutes of its arrival and Cruz-Becerra gave him each unopened package without comment. The *Paul* defendants, on the other hand, were not contacted regarding the drug delivery until days after the vessel where the drugs were located reached the United States. *Id*. at 838, 842. Furthermore, there was no evidence presented in *Paul* that the defendants were able to observe foreign shipping labels or any type of label on the packages indicating that the drugs had come from another country. Accordingly, *Paul* is not controlling here.

Zamora-Salazar's reliance on *Campos* is also misplaced. In *Campos*, we distinguished between "the complete absence of evidence" that a defendant is unaware of a controlled substance's foreign origin and the "minimal" and thus sufficient evidence of such knowledge. 1994 WL 144866, at *11. In that case, this court referenced its opinion in *United States v. Reynolds*, 511 F.2d 603 (5th Cir. 1975), wherein it concluded that an investor in a drug conspiracy could be expected to inquire as to the origin of the drugs. *Id*. at *10. We also referred to our opinion in *United States v. Merritt*, 736 F.2d 223 (5th Cir. 1984), wherein we reasoned that the defendants were on notice of the foreign origin of the drugs because the drugs arrived on an ocean-going vessel. *Id*. at *11. Both of these cases presumably featured "minimal" and thus sufficient evidence that

---

[18] Zamora-Salazar and Diaz arrived to pick up each shipment within the half hour timeframe designated by Victor, indicating that they had contemporaneously communicated with him regarding the drug shipments from Mexico. Additionally, when picking up the first shipment, Diaz asked Cruz-Becerra if he was Victor's cousin, confirming that the men were likely aware that the drugs were being shipped by Victor who lived in Mexico.

the defendant was aware of the foreign origin of the controlled substances. *Id.* at \*10–11.

Here, in contrast, there was more than "minimal" evidence that Zamora-Salazar was aware of the foreign origin of the drugs. The FedEx package that Zamora-Salazar and Diaz picked up from Cruz-Becerra's home displayed a shipping label from Mexico. Zamora-Salazar had a subsequent opportunity to observe the foreign origin of the drugs when he picked up the UPS package, from the same location, displaying yet another shipping label from Mexico. Moreover, Zamora-Salazar's arrival at Cruz-Becerra's home within thirty minutes of Victor messaging Cruz-Becerra from Mexico to alert him that someone was coming to retrieve the drugs indicates that Zamora-Salazar had prior communication with Victor and knew he was retrieving shipments from Mexico before he even saw the shipping labels. A rational jury could reasonably conclude from these facts that there was at least "minimal" evidence that Zamora-Salazar was aware of the foreign origin of the packages containing the methamphetamine. *See id.* at \*11.

In light of the aforementioned reasoning and this court's high level of deference afforded to the jury's verdict on appeal, we hold that sufficient evidence was presented at trial to support Zamora-Salazar's convictions for conspiracy to import and importation of methamphetamine. *See Paul*, 142 F.3d at 841; *Lopez-Monzon*, 850 F.3d at 206; *Gulley*, 526 F.3d at 816.[19]

---

[19] Citing *Paul*, Zamora-Salazar argues that "the fundamental problem with the government's argument is its confusion between evidence that is sufficient to support convictions for conspiring to import and importing a controlled substance and evidence that i[s] sufficient to support convictions for conspiring to possess with intent to distribute and distributing a controlled substance." *See* 142 F.3d at 840–42. The implication here is that the Government charged Zamora-Salazar with the wrong crimes. This argument fails, however, in light of our holding that the evidence was sufficient to support Zamora-Salazar's importation convictions. *See Paul*, 142 F.3d at 841; *Lopez-Monzon*, 850 F.3d at 206.

No. 16-20307

*B. Obstruction of Justice Sentencing Enhancement*

Zamora-Salazar also argues that the district court clearly erred in imposing the sentencing enhancement for obstruction of justice. We disagree.

Section 3C1.1 provides for a two-level enhancement of the offense level if a defendant attempted to obstruct or impede the administration of justice by attempting to threaten, intimidate, or otherwise unlawfully influence a codefendant. U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 cmt. n.4(A) (U.S. SENTENCING COMM'N 2015). A finding of obstruction of justice is a factual finding that is reviewed for clear error. *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008) (per curiam). A factual finding is not clearly erroneous if it "is plausible in light of the record as a whole." *Id.* "[I]n determining whether an enhancement applies, a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error as well." *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

Zamora-Salazar first argues that the district court equated the PSR's version of his alleged threat with Cruz-Becerra's trial testimony and that the district court erred in doing so because these versions differ and trial testimony is more reliable.[20] This argument is not supported by the record. The sentencing transcript reflects that the district court accepted defense counsel's version of Cruz-Becerra's trial testimony for purposes of argument.[21] Defense

---

[20] According to the PSR summary, the Government submitted a Rule 404(b) notice which stated that "[o]n or about May 13, 2015, Zamora-Salazar and Cruz-Becerra were arraigned before Magistrate Judge Nancy Johnson. While in the holding cell at the U.S. Federal Courthouse, Zamora-Salazar threatened Cruz-Becerra by asking him whether he knew what happened to the family members of individuals who 'talk.'" In contrast at the sentencing hearing, defense counsel asserted that Cruz-Becerra testified at trial that Zamora-Salazar said to him "Do you know what you're doing? There could be problems later on."

[21] During the sentencing hearing, the court and the parties acknowledged that they did not have a copy of the trial transcript, which prompted defense counsel to paraphrase

counsel argued that the trial testimony did not support the enhancement and the Government contended that the testimony did support the enhancement. In spite of accepting defense counsel's paraphrased version of Cruz-Becerra's trial testimony, the district court overruled the objection.

Zamora-Salazar further argues that Cruz-Becerra's trial testimony did not support the enhancement because his alleged statements to Cruz-Becerra were too vague to have constituted a threat. As noted, the district court accepted for purposes of argument that Cruz-Becerra testified that he spoke with Zamora-Salazar at the federal courthouse after they were arrested and that Zamora-Salazar asked him if he knew what he was doing and that "there could be problems later on." The record as a whole plausibly reflects that Zamora-Salazar was aware prior to making these statements that Cruz-Becerra had cooperated with the Government by identifying him as a participant in the offense. *See Juarez-Duarte*, 513 F.3d at 208. The record evidence also reasonably supports the conclusion that Zamora-Salazar made these statements in order to threaten or intimidate Cruz-Becerra and to dissuade him from further cooperation. *See Caldwell*, 448 F.3d at 290.

In light of this evidence, we conclude that the district court did not clearly err in imposing the obstruction of justice sentencing enhancement. *See* U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 cmt. n.4(A) (U.S. SENTENCING COMM'N 2015); *Juarez-Duarte*, 513 F.3d at 208.

---

Cruz-Becerra's trial testimony. The district court accepted that version but also commented that it "believe[d] that was the statement made in the presentence report . . . ." We disagree with Zamora-Salazar's argument that the district court's subsequent comment somehow resulted in its acceptance of the PSR version over the trial testimony version of the statement. At most, the district court indicated that it "believed" that the statement in the PSR was similar to the paraphrased trial testimony statement that it had just accepted for purposes of argument. This does not compel the conclusion, however, that the statement in the PSR was the statement the court relied on instead of the trial testimony. Rather, it suggests that the district court did not recall exactly what statement was reflected in the PSR.

No. 16-20307

## III.    Conclusion

For the foregoing reasons, Defendant-Appellant Santos Alfonso Zamora-Salazar's convictions and sentence are AFFIRMED.